**Michael COLELLO and Robert Romano, Plaintiffs,**

v.

**THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, et al., Defendants.**

**No. CV 94–6022 RAP (Ex).**

United States District Court, C.D. California.

Sept. 26, 1995.

Brian O'Neill, Frederick D. Friedman, Edward A. Klein, for Plaintiffs.

Richard Montague, Karen Matteson, Richard Humes, Susan Yashar, John J. Nicholas, for Defendants.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO DISMISS

PAEZ, District Judge.

### I

### *INTRODUCTION*

The Court is called upon to decide the constitutionality of a freeze of plaintiffs' bank accounts in Switzerland, which the U.S. government obtained by making a request pursuant to a treaty between the two nations. This case began as an offshoot of a Securities and Exchange Commission enforcement action. The SEC sued one of the plaintiffs here, Michael Colello, for his part in a pyramid scheme. Colello asserted his Fifth Amendment right against self-incrimination during the investigative stage and has maintained his silence consistently.

The day before the Commission filed the enforcement action against Colello and the other defendants, the SEC sought the freeze of Colello's bank accounts in Switzerland. The Department of Justice, as the Central Authority in this country, transmitted the Request, and the Swiss complied.

At the same time, the Court issued a temporary restraining order in the enforcement action, freezing all the defendants' assets in the United States, including Colello's. The Court did not, however, grant the SEC's motion for a preliminary injunction against Colello, and the domestic asset freeze dissolved along with the T.R.O. Colello then asked the Court to order the SEC to inform the Swiss that Colello's American assets were no longer frozen and to ask the Swiss to release their freeze accordingly. The SEC argued, and the Court agreed, that the Swiss asset freeze had never been a part of the enforcement action and that the Court had not ordered those assets frozen in the first place. The Court denied the motion.

Colello and plaintiff Robert Romano (who is not a defendant in the enforcement action) filed this separate case on September 2, 1994 to challenge the constitutionality of the Swiss asset freeze. They named as defendants the United States Securities and Exchange Commission ("SEC" or "Commission"), SEC lawyers Elaine M. Cacheris, Robert D. LaFramenta, Kathleen Herkenhoff, Gary Garrigues, and Arian Colachis ("the SEC defendants"), Attorney General Janet Reno, George Proctor (Director of the Department of Justice Criminal Division's Office of International Affairs), and Does 1 through 20.

Plaintiffs alleged that defendants violated their Fourth and Fifth Amendment rights when the SEC, through the Department of Justice, sought and obtained a freeze of certain assets located in Switzerland (that is, bank accounts), pursuant to the Treaty between the United States of America and the Swiss Confederation on Mutual Assistance in Criminal Matters.

Defendants do not challenge the Court's ability to pass on the issues presented here, nor do they dispute plaintiffs' standing to raise these questions. As explained more fully below, although courts generally tread lightly when matters involving foreign policy come into play, there are certain circumstances—and this is one—that warrant judicial review.[1]

Defendants Reno and Proctor moved to dismiss or, in the alternative, for summary judgment. They contend that plaintiffs failed to establish a Fourth or Fifth Amendment violation and, in any event, Reno and Proctor are entitled to immunity. Proctor also contends that this Court lacks personal jurisdiction over him.

The SEC defendants argue similarly, although they moved to dismiss. They also submitted outside material that the Court elects not to exclude. Under Rule 12(b) of the Federal Rules of Civil Procedure, their motion is therefore one for summary judgment.

Finally, plaintiffs Colello and Romano have moved for summary judgment or summary adjudication that defendants violated their rights under the Fourth and Fifth Amendments.

The Court has considered fully the moving, opposition, and reply papers, including the supplemental briefs the Court requested following the hearing, as well as the declarations, exhibits, and oral arguments of counsel. The Court previously determined that the individual defendants were entitled to immunity and that personal jurisdiction over

defendant Proctor was lacking and granted these parts of defendants' motions at the hearing. The Court hereby (1) denies defendants' motions on the remaining grounds, (2) grants plaintiffs' motion for summary adjudication on the issue of the violation of their Fifth Amendment rights; and (3) grants plaintiffs' motion on Fourth Amendment grounds based on use in the Treaty of a "reasonable suspicion," rather than a probable cause standard.

## II

### RELEVANT BACKGROUND

#### A. Uncontroverted Facts

The parties agree that the following facts are uncontroverted, unless otherwise indicated.

In October 1993, the SEC began investigating Cross Financial Services, Inc. after discovering through a newspaper article that CFS promised very high rates of return to investors in a "government receivables" investment program. The Commission issued a formal order of investigation on December 3, 1993.

In April 1994, the SEC subpoenaed records and testimony from Michael Colello in connection with the investigation of CFS. When the SEC lawyers asked Colello during his investigative testimony about CFS, Carroll Siemens, letters of credit, European and American banks, and his bank accounts, he asserted his privilege against self-incrimination and refused to answer.

Robert Romano was not a subject of the SEC investigation.

On June 13, 1994, the Department of Justice sent to the Central Authority of Switzerland a Request for Assistance in the Matter of Cross Financial Services, Inc. ("the Request") in connection with the SEC's investigation. George Proctor, Director of the Office of International Affairs, Criminal Division, DOJ, stated in the Request that the

---

1. "Although courts are not often called upon to review the constitutionality of treaty provisions, there is no doubt that the power to make treaties is circumscribed by substantive provisions of the Constitution, and that the courts are competent to pass on the constitutionality of treaties." *In re*

*Aircrash in Bali, Indonesia on April 22, 1974*, 684 F.2d 1301, 1308–09 (9th Cir.1982), *citing Reid v. Covert*, 354 U.S. 1, 16–19, 77 S.Ct. 1222, 1230–31, 1 L.Ed.2d 1148 (1957); *Geofroy v. Riggs*, 133 U.S. 258, 267, 10 S.Ct. 295, 297, 33 L.Ed. 642 (1890).

SEC sought "documents and testimony from banks in Switzerland to establish whether CFS made false statements about its investment scheme to induce people to invest and, thereafter, misappropriated investors' funds in violation of U.S. federal securities laws." The SEC needed this information, Proctor wrote, "[t]o determine whether to refer this matter to U.S. law enforcement authorities for criminal prosecution." Request, p. 1. In addition, "to prevent the dissipation of investor funds, the SEC requests that any funds traceable to the subject matter of this request be frozen so that the funds later may be returned to the U.S. to compensate the victims of the fraud." DOJ further asked that the freeze take place on June 16, 1994. *Id.*, p. 2.

In the Request, the DOJ listed Mike Colello as Siemens' (one of the defendants in the SEC enforcement action) " 'overseas contact' for CFS's business." Colello was also "believed to be associated with CFS or its principals" as well as one to whose accounts "[m]oney obtained from investors may have been diverted[.]" *Id.*, p. 8. DOJ requested, among other things, as follows:

> Please freeze funds in the accounts listed in the Attachment at Finter Bank Zurich and at Bank Leu A.G., as well as any funds in other accounts at Finter Bank Zurich, Bank Leu A.G. and any other bank in Switzerland traceable to the subject matter of this request, including funds in the name of any of the above-mentioned parties . . ., so that the funds are available for return to the victims.

*Id.*, p. 10.

On June 23, 1994, the Securities and Exchange Commission filed its Complaint for Temporary Restraining Order, Preliminary and Permanent Injunctions, Appointment of a Receiver, and Other Equitable and Legal Relief ("the Complaint") against Cross Financial Services, Inc., Owen R. Fox, Carroll E. Siemens, Bruce Franklin, Michael J. Colello, and Douglas S. Cross (*Securities and Exchange Commission v. Cross Financial Services, Inc., et al.*, Case No. CV–94–4228

RAP (Ex)) ("the SEC enforcement action"). Romano is not a defendant in that action.

That same day, the SEC applied *ex parte* for a "Temporary Restraining Order, Temporary Orders: (1) Prohibiting the Transfer of Assets and Destruction of Documents; (2) Freezing Assets; (3) Appointing a Receiver; and (4) For an Accounting, Order to Show Cause Why a Preliminary Injunction Should Not be Granted and the Temporary Orders Should Not Be Continued, and Request for Waiver of Notice Pursuant to Local Rule 7.18.2" ("the *Ex Parte* TRO Application"). The Commission submitted three volumes of exhibits supporting its application.

Judge Hatter entered an order granting the SEC's *Ex Parte* TRO Application on June 23, 1994, appointing Richard G. Shaffer the temporary receiver. The Court granted a preliminary injunction with respect to two of the defendants, CFS and Franklin, that same date. The preliminary injunction hearing was set for July 5, 1994.

On June 24, 1994, the Swiss Central Authority ("SCA") issued an order granting the Request. Declaration of Michel–Andre Fels ("Fels Dec."), ¶ 5.[2] "Pursuant to that Order, certain banks in Switzerland were directed to freeze assets as requested in DOJ's June 1994 Request for Assistance." *Id.* The banks were required to notify "persons affected by the Order" as well as to provide them with a copy of the Order. *Id.* Neither the DOJ nor the SEC controlled the freeze of the Swiss bank accounts. The SEC and DOJ did not intend to freeze Romano's accounts and do not know which accounts were frozen. The U.S. government never notified Colello or Romano of the Request or the order freezing their bank accounts prior to or following the order.

The SEC enforcement action was then transferred to this Court, and on July 26, 1994, the Court issued a preliminary injunction enjoining Fox, Siemens, and Cross, but not Colello. On July 27, 1994, the Court entered a separate order denying the SEC's request for a preliminary injunction against Colello and other relief and dissolving the

---

**2.** Michel–Andre Fels is the head of the Swiss Federal Office for Police Matters at the Swiss Central Authority and is responsible for evaluating United States Treaty requests.

June 23, 1994 temporary restraining order against him.

Colello then moved to compel compliance with the order, asking the Court to order the Commission to direct the Swiss Central Authority to release the asset freeze. The SEC argued and the Court agreed that the Swiss asset freeze had never been involved in the SEC enforcement action and was not addressed in any of the orders concerning the freeze of Colello's assets. Colello's motion was denied on August 22, 1994.

Colello and Romano have been represented in Switzerland by attorney Ernst A. Widmer of Zurcher Blickenstorfer & Widmer, Zurich, who objected to the SCA on plaintiffs' behalf. He submitted a copy of the Court's Order of July 25, 1994, in which the temporary restraining order against Colello was dissolved. The SCA denied Widmer's request, but requested that the SEC explain why the freeze should remain in effect in light of the order.

By letter dated August 19, 1994, Widmer asked Fels why the freeze remained in force: "Mr. Colello has regained full control of his assets located in the U.S. which previously have been the subject of freezing under a temporary restraining order. Why should Switzerland be amenable to intrude more into a citizen's rights than the United States Government is entitled to?"

The DOJ responded to the SCA inquiry on August 19, 1994: "We note that the court's July 25, 1994 ruling with regard to Colello was merely a preliminary one, and that Colello remains a defendant in this case." The DOJ attorney stated that the SEC had continued to gather evidence against all the defendants, and noted that "the SEC filed evidence with the court further linking Colello to Defendant Cross Financial Services, Inc. ("CFS"). In particular, the SEC has learned through telephone records that over 200 telephone calls took place between CFS' offices and Colello's residence during the period of June 1, 1993, and December 21, 1993, a period during which several transfers were made by CFS and persons affiliated with CFS to accounts at banks in Switzerland."

DOJ explained that it did not intend to "withdraw or modify the Treaty request as it relates to any freeze of assets in Swiss banks" based on the SEC's position that the Court's July 25, 1994 did not affect the Treaty request.

By telefax dated August 24, 1994, Widmer argued to Fels that the diplomatic note(s) of November 3, 1993 linked any legal assistance requested of Switzerland to proceedings instituted in the United States. Widmer added that the diplomatic note "does not specifically address the problem whether certain restrictive and infringing matters may be sought under the treaty irrespective of whether an analogous measure has found approval or has been denied or removed in the proceeding forming the legal basis for the legal assistance application." *Id.* Widmer contended that the SCA had to honor the findings made in this Court regarding the propriety of a freeze of Colello's assets: "if a certain motion such as a freezing order has been denied or vacated in the U.S. proceeding forming the basis for the legal assistance request, then the corresponding freezing order made out under the treaty must be denied or vacated as well." *Id.* Otherwise, Switzerland's coercive measures would go further than those allowed in an American proceeding. *Id.,* p. 20. Widmer then asked whether any deadline had been imposed on the SEC. *Id.*

Widmer renewed his request to the SCA to lift the freeze by telefax filed on August 24, 1994. Upon receiving no response, Widmer filed a formal brief on September 30, 1994 "in support of the objections of Messrs. Colello and Romano regarding the freezing order and the propriety of the legal assistance[.]"

The SEC's First Amended Complaint was filed on May 8, 1995. The Commission changed defendant Colello's status to a "nominal" or "relief" defendant and deleted the request for damages.

On June 15, 1995, the Swiss Federal Supreme Court rejected plaintiffs' contention that the asset freeze was improper, explaining:

In matters of judicial assistance, the Federal Supreme Court examines an administrative court complaint only to determine whether the preconditions for the provision

744

of judicial assistance have been met. If the judicial assistance is requested by the United States, it cannot be denied just on the basis of deficiencies in the American proceedings, because the treaty does not contain any corresponding provision. Even alleged violations of human rights in the American proceedings form no basis for denying judicial assistance. The complaint of a "control vacuum" deals with an alleged deficiency in the American proceedings, which if it is true, must be heard before the American courts. The objection raised in the Swiss proceedings with respect to the denial of justice is unfounded. *Colello and Romano v. Federal Office of Police Affairs (Central Office for the USA),* Decision of the Swiss Federal Supreme Court, 1A.108/1995/szu (June 15, 1995) (certified translation), p. 3.

Finally, the Court has just issued an order in the SEC enforcement action. The Court has found that there is no genuine issue of material fact as to Colello's improper receipt of CFS investors' funds and that, as a matter of law, disgorgement is appropriate, indeed, necessary. The Court has therefore ordered Colello to disgorge the sum of $2,620,598 and $276,954.63 in prejudgment interest.[3]

### B. *The Treaty*

The Treaty between the United States of America and the Swiss Confederation on Mutual Assistance in Criminal Matters ("the Treaty"), 27 U.S.T. 2019, T.I.A.S. No. 8,302, was signed at Bern, Switzerland on May 25, 1973 and entered into force on January 23, 1977. The parties to the Treaty agreed to assist each other in:

a. investigations or court proceedings in respect of offenses the punishment of which falls or would fall within the jurisdiction of the judicial authorities of the requesting State or a state or canton thereof;

b. effecting the return to the requesting State, or a state or canton thereof, of any objects, articles or other property or assets belonging to it and obtained through such offenses;

c. proceedings concerning compensation for damages suffered by a person through unjustified detention as a result of action taken pursuant to this Treaty.

Art. 1, § 1. The Treaty provides in relevant part that "an offense in the requesting State is deemed to have been committed if there exists in that State a reasonable suspicion that acts have been committed which constitute the elements of that offense." Art. 1, § 2.[4] Moreover, the parties agreed that "assistance as provided by this Treaty will also be granted in certain ancillary administrative proceedings in respect of measures which may be taken against the perpetrator of an offense falling within the purview of this Treaty." Art. 1, § 3. "[E]xchange of diplomatic notes" would "conclude" any such agreements. *Id.*

Secretary of State Warren Christopher and Swiss Ambassador Carlo Jagmetti exchanged diplomatic notes on November 3, 1993 to include other types of violative conduct within the terms of Article 1, § 3 of the Treaty, notably, "offenses in connection with the offer, purchase or sale of securities[.]" State Dept. No. 93–218, 1993 WL 544335. Assistance would thus "be granted in connec-

---

3. Although it might appear at first that the disgorgement order and the instant order operate at cross-purposes, this is not so. The Court expects that the disgorgement order and accompanying judgment will be transmitted to the Swiss Central Authority with a request that any funds in Colello's name or within his control be returned to the court appointed receiver for CFS. Under these circumstances, injunctive relief will probably be unavailable to Colello given the fact that the Court has already found that he is not entitled to the Cross Financial Services investors' funds. Colello's remedy for the constitutional violations adjudicated here, if any, would be damages. The Court does not consider at this point what the measure of damages might be,

especially given the finding in the disgorgement order that the funds Colello has received, including presumably those in the Swiss accounts, are not *his* to keep.

4. The Technical Analysis of the Treaty Between the United States and Switzerland on Mutual Assistance in Criminal Matters Signed at Bern, May 25, 1973 ("Tech.Anal.") explains: "The 'reasonable suspicion' standard is less stringent than the 'probable cause' standard applicable in the United States for the issuance of arrest and search warrants. This permits the verification of suspected offenses, which is one of the principal purposes of the Treaty." Tech.Anal., pp. 36–37.

tion with the following proceedings, including formal investigations that may lead to such proceedings" [in relevant part]:

(1) Suits in a court of the United States seeking permanent or preliminary injunctions or temporary restraining orders or enforcement proceedings before the SEC ... seeking cease-and-desist orders;

(2) Suits in a court of the United States or enforcement proceedings before the SEC ... seeking equitable relief ancillary to the relief sought in paragraph (1) above, such as a freeze of assets or the disgorgement of profits gained (or losses avoided) as a result of violative conduct[.]

*Id.*, pp. *1, 4. The diplomatic notes further provide that "the Treaty should be used to the extent feasible," and that "an investigation by the SEC ... is to be considered an investigation for which assistance can be furnished (if the other requirements of the Treaty are met) as long as the investigation relates to conduct which might be dealt with by the criminal courts of the United States." *Id.*, pp. *2, 4.

The Treaty specifies "discretionary assistance"[5] and "compulsory measures." It also lists in a separate schedule the "offenses for which compulsory measures are available." 27 U.S.T. at 2064–67. The Treaty restricts the use of compulsory measures to those "provided in that State for investigations or proceedings in respect of offenses committed within its jurisdiction." Art. 4, § 1, 27 U.S.T. at 2028. Compulsory measures are to be used, even if the requesting State fails to mention them in the request, "but only if the acts described in the request contain the elements, other than intent or negligence, of an offense:

**5.** Article 3 provides:

1. Assistance may be refused to the extent that:
a. the requested State considers that the execution of the request is likely to prejudice its sovereignty, security or similar essential interests;
b. the request is made for the purpose of prosecuting a person, other than a person described in paragraph 2 of Article 6, for acts on the basis of which he has been acquitted or convicted by a final judgment of a court in the requested State for a substantially similar of-

a. which would be punishable under the law in the requested State if committed within its jurisdiction and is listed in the Schedule; or

b. which is described in item 26 of the Schedule.[6]

Art. 4, § 2, 27 U.S.T. at 2028–29. The requested State is required to base its decision on whether the conditions in § 2 have been met "only on the basis of its own law." Art. 4, § 4, 27 U.S.T. at 2029.

Article 9 of the Treaty specifies that "[a] search or seizure may only be made in accordance with the law of the place where the request is executed."

Congress never enacted any implementing legislation, and neither DOJ nor SEC has promulgated regulations. Legislation was contemplated initially:

While no implementing legislation by the United States appears to be necessary, the Department of Justice is considering the advisability of proposing limited legislation which would specifically authorize United States District Courts to issue subpoenas for testimony and documents and to provide for deposition proceedings under court supervision. The Department of Justice intends to utilize Federal courts and agencies to carry out the Treaty's substantive obligations.

Statement of John C. Keeney, Deputy Assistant Attorney General, Criminal Division, S.Rep. No. 29 (Exec.), 94th Cong., 2d Sess. at 5 (1976). DOJ and SEC referred to "applicable guidelines," that is, the United States Attorneys' Manual ("the Manual"), which describes Treaty requests. The Manual states that "[a]ll treaties currently in force designate the Department of Justice as the au-

fense and any sentence has been or is being carried out.
2. Before refusing any request pursuant to paragraph 1, the requested State shall determine whether assistance can be given subject to such conditions as it deems necessary. If it so determines, any conditions so imposed shall be observed in the requesting State.

**6.** Item 26 in the Schedule is "Offenses against the laws relating to bookmaking, lotteries and gambling when conducted as a business." 27 U.S.T. at 2066.

thority competent to make the request, which is therefore signed in the Department *rather than by a judge.*" ¶ 9–13.522B (emphasis added). Nothing in the Manual requires SEC or DOJ to notify the subject of a Treaty request or to provide a hearing before or after making the request. The manual contains no standards, and the following disclaimer appears on the first page:

> The Manual provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations hereby placed on otherwise lawful prerogatives of the Department of Justice.

¶ 1–1.100.

Switzerland, however, has enacted law and guidelines under the Treaty. In Switzerland's Federal Law on the Treaty with the United States of America on Mutual Legal Assistance in Criminal Matters (of October 3, 1975) ("Fed.Law"),[7] certain "precautionary measures" are set forth, as follows:

> If execution of the petition does not appear to be obviously inadmissible or inexpedient, the Central Headquarters and, after taking it into consideration, the executive body as well, by virtue of its office, or at the request of a party or the American Central Headquarters can prescribe precautionary measures to retain the existing status, to protect threatened legal interests, or to safeguard endangered evidence.

Art. 8. Article 8 further specifies that "[o]bjections and complaints against decisions under this Article have no suspensory effect." *Id.*

The Federal Law sets forth the procedure for responding to a petition in Article 10:

> If a petition meets the formal requirements of the Treaty and appears not to be *obviously inadmissible* for the rendering of legal assistance, the Central Headquarters determines the body to execute it,

issues the directives for execution of the petition in accord with Article 5 *without a hearing of the parties,* and if necessary takes precautionary measures in accord with Article 8, and passes on the files to the executive body. Thereby it judges on the basis of the described facts of the case in the petition or its documentation whether the actions based on American procedure are punishable under Swiss law.

*Id.* (emphasis added.) Article 16, moreover, sets forth the procedure for objecting. Notably, "[a]ny person affected by a legal assistance proceeding and has an interest worthy of protection" may object by written objection submitted within ten days after Central Headquarters announces the order. Article 16 further states that "[t]he objection has a suspensory effect, unless there is danger in delay or the injury substantiated by the objector could only come about as a result of the transmission of the executive order enforcements to the American authorities."

The Federal Office for Police Matters ("FOPM") has also issued guidelines "for informing interested authorities and citizens on what is meant and encompassed by international mutual assistance in criminal matters." The guidelines describe legal remedies and the appeal process, then state:

> [T]he objection that the accused has not committed the offence or that he is not guilty will be dismissed, for this is a matter to be judged by the *court* in the requesting State and this judgment cannot be made in the mutual assistance proceedings.... there is no point in contesting the facts or guilt, as *the requested Swiss authorities are bound by the summary of the facts given in the request for assistance and may deviate from there only if there are obvious errors, gaps or contradictions that can be immediately established*[.] [8]

*Id.,* p. 15 (emphasis added). Requests made on behalf of administrative authorities, including the SEC, are treated "as equal to

---

7. The SEC provided a certified translation of the law.

8. *See also* the guidelines' comment that "the requested Swiss authorities are bound by the account of the facts in the request and the re-

questing authority cannot be obliged to furnish proof of the accuracy of the summary of the facts ...; it is sufficient if *reasonable suspicion* is shown[.]" (Emphasis added.)

judicial ones provided there is the possibility of appeal to a judge in the foreign proceedings[.]" *Id.,* pp. 15–16.

The guidelines list the bases for denying assistance, including the failure of the requesting State to guarantee reciprocity, the fact that the offense is one that Switzerland considers to be political, and where "[g]rave defects of the foreign procedure" exist. *Id.,* pp. 21–24. Assistance may also be denied if "the execution of the request is likely to prejudice sovereignty, security or similar essential interests of Switzerland[.]" *Id.,* p. 35.

## III

### *DISCUSSION*

#### A. *Standard*

■ As the parties have submitted matter outside of the pleadings which ought to be considered by the Court, the SEC's motion and the Reno and Proctor motion are treated as motions for summary judgment.[9]

■ Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Summary judgment "terminates the action without trial" and is a "judgment 'on the merits.'" Schwarzer, Tashima, and Wagstaffe, *California Practice Guide: Federal Civil Procedure Before Trial* (*"Fed.Civ.Proc."*), § 14:28 (1994). Not only is summary judgment not "disfavored," but it is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corporation v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

In a trilogy of 1986 cases, the Supreme Court clarified the standard for summary judgment. *See Celotex Corporation v. Ca-* trett, *supra; Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Matsushita Electrical Industry Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

■ The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. The Court determines a fact's materiality according to the governing substantive law; if the fact may affect the outcome, it is material. *Id.* at 248, 106 S.Ct. at 2510. If the moving party seeks summary adjudication with respect to a claim or defense upon which it bears the burden of proof at trial, its burden must be satisfied by affirmative admissible evidence. By contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case. *See Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553; *see also Fed.Civ. Proc.,* §§ 14:123–141.

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

■ In assessing whether the non-moving party has raised a genuine issue, the Court must believe the nonmovant and draw all justifiable inferences in his favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513, *citing Adickes v. S.H. Kress and Company,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Nonetheless, "the mere existence of a scintilla of evidence" is insufficient. *Id.* 477 U.S. at 252, 106 S.Ct. at 2512. As the Court explained in *Matsushita:*

the evidence they hoped to acquire through discovery, but simply listed all the factual allegations of their complaint. They have not properly supported their Rule 56(f) request, which is hereby denied.

9. Although plaintiffs opposed the Reno and Proctor motion in part on the basis of their purported need for discovery, they nevertheless cross-moved for summary adjudication on the Fourth and Fifth Amendment claims in their complaint. Moreover, plaintiffs made no specific showing of

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

475 U.S. at 586–87, 106 S.Ct. at 1355–56.

## B. *Analysis*

### 1. *Propriety of Court Review of Treaty*

■ The Government has not challenged the Court's ability or authority to consider the issues plaintiffs have raised regarding the constitutionality of the Treaty. The Court is mindful nonetheless that the political question doctrine.

> excludes from judicial review those controversies which revolve around policy choices and value determination constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch. The Judiciary is particularly ill suited to make such decisions, as 'courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature.'

*Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986) (citations omitted). It is equally true, though, that "not every matter touching on politics is a political question." 478 U.S. at 229, 106 S.Ct. at 2865. As the Supreme Court confirmed, "the courts have the authority to construe treaties and executive agreements ... [U]nder the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones." *Id.* at 230, 106 S.Ct. at 2866.

■ The Ninth Circuit has reiterated that "treaties, under the Constitution, are the supreme law of the land." Moreover, "treaty provisions which create domestic law ... are subject to the same substantive limitation as any other legislation. *Reid v. Covert*, 354 U.S. at 16–18, 77 S.Ct. at 1230–1231." *In re Aircrash in Bali*, 684 F.2d at 1309. Otherwise, the executive could circumvent a constitutional limitation on governmental power via a treaty, "although the same objective could not be accomplished through legislation." *Id.*

The Ninth Circuit has also cautioned that treaties are due the same presumption of constitutionality as are statutes, and that a court reviewing the treaty's provisions "must studiously avoid imposing its own view of foreign policy objectives and must accept the foreign policy formulations of the executive and legislative branches." *Id.* Recognizing these parameters, "the treaty at issue ... must withstand essentially the same tests as would domestic legislation against a claim that it denies rights guaranteed by the Constitution." *Id.* In sum, the Supreme Court has left no doubt that a review of plaintiffs' claims that defendants violated their constitutional rights is a proper exercise of judicial power.

### 2. *Denial of Due Process*

Plaintiffs Colello and Romano contend that they were denied due process because neither the SEC nor DOJ notified them that their assets in Switzerland were being frozen and because neither SEC nor DOJ conducted a hearing before or after the freeze. The Government contends that plaintiffs were not entitled to a pre-deprivation hearing and that the Swiss afforded plaintiffs ample process.

■ The Government acknowledges that "[a]s a general rule, ... due process requires a hearing before a person may be deprived of her property." *Spiegel v. Ryan*, 946 F.2d 1435, 1439 (9th Cir.1991), *citing Fuentes v. Shevin*, 407 U.S. 67, 90, 92 S.Ct. 1983, 1999, 32 L.Ed.2d 556 (1972). The principle "reflects the high value embedded in our constitutional and political history, that we place on a person's right to enjoy what is his, free of governmental interference." *Fuentes*, 407 U.S. at 81, 92 S.Ct. at 1994. Moreover, "when a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented." *Id.* To serve the full purpose of the right to notice and a hearing, the Court explained, "it

must be granted at a time when the deprivation can still be prevented." *Id.*

The general rule regarding predeprivation hearings yields, however, " 'in extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.' " *Id.* at 82, 92 S.Ct. at 1995, *quoting Boddie v. Connecticut,* 401 U.S. 371, 378–79, 91 S.Ct. 780, 783, 28 L.Ed.2d 113 (1971). The right to be heard does not depend either on "an advance showing that one will surely prevail at the hearing[,]" or on the importance of the property interest. *Id.* 407 U.S. at 88, 92 S.Ct. at 1997–98.

■ Notice and a hearing may be postponed only in "truly unusual" situations. *Id.* at 90, 92 S.Ct. at 1999. The Court in *Fuentes* formulated the "test" as follows:

> First, ... the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for prompt action. Third, the State has kept strict control over its monopoly of legitimate force; the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.

*Id.* at 91, 92 S.Ct. at 2000. Thus, in *Fuentes,* the Court found that the Florida and Pennsylvania replevin statutes "work[ed] a deprivation of property without due process of law insofar as they deny the right to a prior opportunity to be heard before chattels are taken from their possessor." *Id.* at 96, 92 S.Ct. at 2002. There, however, only private interests were at stake and no showing had been made of the need for prompt action. In addition, the replevin statutes "abdicate[d] effective state control over state power." Private parties could unilaterally invoke state power without *official review* of the basis for the claim or the need for immediate seizure. "There is not even a requirement that the plaintiff provide any information *to the court* on these matters. The State acts largely in

the dark." *Id.,* 93, 92 S.Ct. at 2001 (emphasis added).

The Ninth Circuit applied the *Fuentes* factors in *Spiegel v. Ryan,* 946 F.2d 1435 (9th Cir.1991), which involved the Office of Thrift Supervision's ("OTS") issuance of a temporary cease and desist order requiring a former officer of Columbia Savings and Loan Association to make restitution of $21 million pending an administrative hearing to determine whether a permanent cease and desist order should issue. Spiegel challenged the order as a prehearing deprivation of property without due process.

The OTS had commenced a formal investigation of Columbia and Spiegel on November 28, 1989. Over seven months later, the OTS issued a "Notice of Charges and Hearing and Notice of Intention to Remove and Prohibit, and to Direct Restitution, and Notice of Assessment of Money Penalty" ("Notice"). The Notice charged Spiegel with misappropriating corporate assets, among other things. The Notice informed Spiegel of the administrative hearing date set two months later to determine whether OTS should issue a permanent cease and desist order. The same day, OTS issued a Temporary Order to Cease and Desist requiring Spiegel to make restitution to Columbia in the sum of $21 million by the *next day.* 946 F.2d at 1437.

Spiegel filed a complaint the next day seeking injunctive relief from the Temporary Order in part on the grounds that the statute as OTS interpreted it authorized a prehearing deprivation of his property without due process.[10] The District Court agreed and enjoined OTS from enforcing the Temporary Order. *Id.* at 1438.

The Ninth Circuit reversed. The court agreed as to the first two *Fuentes* factors but disagreed on the third. Specifically, the Ninth Circuit concurred that the Temporary Order "served an important government interest, which Congress identified as fighting insider abuse of savings institutions in order to maintain the integrity of savings and loan institutions, as well as to protect the public

---

10. Spiegel also argued that the statute did not even authorize restitution. The Ninth Circuit rejected this contention, noting that "restitution may not only compensate an institution for past

wrongs, but may also serve to prevent the dissipation of assets that may belong to it, and thereby prevent prejudice to its depositors." *Id.* at 1439.

fisc, which, because of deposit insurance, is obligated to make good on most of the deposits in those institutions." *Id.* at 1440.

On the second *Fuentes* factor, the Ninth Circuit again agreed that OTS had to act promptly once its examiners confirmed Spiegel's loans to friends and inappropriate personal purchases, as well as his acceptance of inflated compensation. The court noted that OTS was not unreasonable in issuing the Temporary Order to "avoid the risk that he would dissipate his assets or attempt to put them beyond the government's reach." *Id.*

With respect to the third *Fuentes* prong, however, the Ninth Circuit found that a combination of factors provided "substantial assurance" that the charges were not "baseless or unwarranted": [11]

> [T]he OTS was required to meet specific statutory requirements before issuing the order, the decision to issue the order was made by the head of the agency expert in these matters, and his decision was supported by detailed findings of Spiegel's misconduct following a long investigation by the OTS's examiners, the results of which were submitted to the district court under penalty of perjury.

*Id.* The Ninth Circuit did not require, as Spiegel contended, that there be an "independent institutional check" on the agency action before a person could be denied property without a prior hearing. Rather, a statutory scheme with "sufficiently tight standards to channel the agency's discretion" would suffice. *Id.* at 1441. Given "the industry involved, and the degree of regulation that exists in that industry," the court found that the standards guiding the OTS were "not constitutionally impermissible." *Id.* The prehearing deprivation thus did not violate Spiegel's due process rights. *Id.* at 1442.

After finding that Spiegel was not entitled to a predeprivation hearing, the Ninth Circuit noted that the statute mandated "a full postdeprivation hearing subject to judicial review[.]" In addition, it provided the party an opportunity to seek an injunction within ten days of the temporary order's issuance "setting aside, limiting, or suspending the enforcement, operation, or effectiveness of such order." *Id.* The court thus held that the statute afforded Spiegel adequate process.

■ As in *Spiegel,* the circumstances here satisfy the first two elements of the *Fuentes* test. That is, notwithstanding plaintiffs' characterization of the SEC's efforts to prevent the dissipation of assets as "[o]btaining a prejudgment writ of attachment in a civil action," the asset freeze *did* "secure an important governmental or general public interest." Unlike the replevin statutes at issue in *Fuentes,* the SEC's Swiss asset freeze was not simply one private party attempting to repossess chattel, but an important part of the Commission's effort to minimize (and secure a remedy for) the harm suffered by hundreds of defrauded investors.

Liquid assets in a foreign country can, of course, disappear rapidly. The SEC's decision not to risk dissipation was necessarily reasonable given plaintiff Colello's assertion of his Fifth Amendment privilege against self-incrimination and the patent irregularity (to put it most generously) of the letters of credit he procured with CFS investors' funds. As the Ninth Circuit indicated in *Spiegel,* when it appears that funds are being misused and the government agency attempts to prevent dissipation of those assets, the second *Fuentes* requirement is satisfied. 946 F.2d at 1440.

The third factor presents an insurmountable obstacle to defendants.[12] That is, *Fuentes* required that the statutory scheme

---

11. *See Federal Deposit Insurance Corp. v. Mallen,* 486 U.S. 230, 240, 108 S.Ct. 1780, 1787, 100 L.Ed.2d 265 (1988) ("[a]n important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation.")

12. The Court so informed counsel at the hearing on these motions and requested further briefing on this issue and several others, including the appropriate standard for domestic asset freezes and the possible justification for a less rigorous standard for a foreign asset freeze. The Court also requested that the parties provide the legislative history of the Treaty. This information was not submitted.

include "sufficiently tight standards to channel the agency's discretion." 407 U.S. at 91, 92 S.Ct. at 1999. The Treaty does not even mention asset freezes. The diplomatic note(s) do not provide the "tight standards" either. Congress has not enacted any legislation nor have the SEC or DOJ promulgated regulations to implement the Treaty. And nothing in the Treaty or diplomatic notes requires any judicial review, prompt or otherwise.[13] Thus, contrary to the Commission's contention that its decision to freeze Colello's Swiss assets rested on statutory bases "at least as strong as those approved of in *Spiegel,*" *no* standards appear in the Treaty or diplomatic notes, no legislation or regulations even exist, and no administrative or judicial review is mandated, before *or* after an asset freeze.[14]

 And, as noted above, although SEC and DOJ have referred to "applicable guidelines," that is, the United States Attorneys' Manual ("the Manual"), the document expressly prohibits its use in the manner urged here:

The Manual provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations hereby placed on otherwise lawful prerogatives of the Department of Justice.

¶ 1–1.100. Nothing in the Manual requires SEC or DOJ to notify the subject of a Treaty request of the request or to provide a hearing before or after making the request. The Manual sets forth no restrictions on the duration of a freeze. The Manual further confirms the agencies' view that judicial oversight is unnecessary: "[a]ll treaties currently in force designate the Department of Justice as the authority competent to make the request, which is therefore signed in the Department *rather than by a judge.*" ¶ 9–13.522B (emphasis added). And the Manual specifies no standards other than those related to the form of the request. Even if the

---

**13.** One of the few cases to consider the propriety of asset freezes under the Treaty offers only limited guidance. In *Barr v. United States Department of Justice,* 819 F.2d 25 (2d Cir.1987), the New York Attorney General had been investigating plaintiff for several years on fraud charges. Plaintiff was *indicted* by the state grand jury for conspiracy, fraud, and grand larceny, and the Attorney General *then* asked DOJ to transmit a Request for Assistance to Switzerland to freeze Barr's accounts and companies under his control in that country, which DOJ did the day after the indictment.

Barr pursued his remedies in Switzerland and filed a federal action in New York, requesting injunctive and monetary relief. Applying the "particularly stringent" standard for injunctions that "interfere with the executive branch's conduct of foreign affairs," the District Court had denied Barr's request for a preliminary injunction. The Second Circuit affirmed the denial.

The Second Circuit recognized that any complaint Barr had was with the U.S., not the Swiss, government. After all, the Swiss authorities had done only what the American officials had requested. *Id.* Moreover, Barr had "not shown that either country had violated the Treaty or deprived him of constitutional rights." *Id.* at 28. A grand jury had already found *probable cause* to believe a crime had been committed, and Barr learned quickly of the freeze, which he challenged at home and abroad. "At the same time, New York was pursuing its criminal case in a timely fashion." And Barr could raise in those

proceedings his claim that the Attorney General had violated state law. Moreover, "[i]n the event of an acquittal in that action, Barr's funds would be released to him." *Id.* at 28. The court thus determined that Barr had received the protections of the very judicial process that had supported the Treaty request.

It does not appear that Barr even raised the issue of the lack of "tight standards" in the Treaty. Rather, he based his challenge principally on the State Attorney General's authority to request the freeze and the evident lack of authority under the Treaty to permit the freeze (a moot argument for the instant case following the exchange of diplomatic notes in 1993). Neither the district court nor the Second Circuit seemed at all persuaded by the due process argument given Barr's indictment by the grand jury (a higher standard than the Treaty required). The Second Circuit's analysis did not anticipate or resolve the deprivation of notice and a hearing completely or the applicable standard for an asset freeze in the absence of administrative or judicial review in the U.S.

**14.** As plaintiffs have noted, not only do they lack any right of judicial review under the Treaty or diplomatic notes, but SEC and DOJ effectively urged the Swiss Central Authority *not* to rely on this Court's decision to dissolve the domestic freeze of Colello's assets. SEC and DOJ did not consider this Court's findings regarding Colello to be binding and consequently, neither did the Swiss.

Manual set forth standards and procedures adequate to pass Constitutional muster in this situation, which it does not, by its very terms, it cannot satisfy the third prong of *Fuentes*.

The Government does not deny that plaintiffs are entitled to due process. Rather, SEC and DOJ dispute when process is due and who must provide it. Their position is unavailing.

■ Regarding the first question, defendants argue that plaintiffs were not entitled to predeprivation notice or a hearing. They contend that, in appropriate circumstances, a hearing may be *postponed*. The Government thus states the law correctly, but fails to reconcile it with the Treaty's failure to require either the SEC or DOJ to notify Colello or Romano of the Request or the freeze order, to provide a predeprivation hearing, and to conduct a hearing after the freeze took effect. There is no authority for dispensing altogether with notice and a hearing, as occurred here. Although plaintiffs are not entitled to a predeprivation hearing, they *are* entitled to a post-freeze hearing. The undisputed fact is that they received *no* process at all in violation of their rights under the Fifth Amendment.

The Government also contends that no U.S. official needed to notify plaintiffs or conduct a hearing on the Swiss asset freeze because the Swiss do so. It is the United States Government, of course, that has requested that Switzerland freeze plaintiffs' assets in the first place. Yet, the Treaty does not require Swiss authorities, assuming that they *could* act as U.S. agents in providing plaintiffs the process they are entitled to, even to report to the responsible U.S. agencies. Defendants concede this point, stating that they do not even know which bank accounts the Swiss have frozen and that they never asked the Swiss to freeze those of plaintiff Romano at all. Moreover, the Swiss are bound by the SEC's fact summary included in DOJ's Treaty Request. FOPM Guidelines, p. 15. Swiss authorities are not required to (and did not here) consider alleged deficiencies in the American proceed-

ings. Switzerland thus does not purport to provide notice and a hearing regarding actions of the United States Government. Indeed, the Swiss Federal Law provides in relevant part:

> If a petition meets the formal requirements of the Treaty and appears not to be *obviously inadmissible* for the rendering of legal assistance, the Central Headquarters determines the body to execute it, issues the directives for execution of the petition in accord with Article 5 without a hearing of the parties, and if necessary takes precautionary measures in accord with Article 8, and passes on the files to the executive body.

Fed.Law, Art. 10 (certified translation; emphasis added). Although Swiss Federal Law does allow for objections, the grounds are narrowly circumscribed. *Id.*, Art. 16(2).

Most important, even if there were some way that the Swiss Central Authority might be said to be the "agent" of the United States when responding to Treaty requests,[15] nothing in the Treaty or diplomatic notes requires Switzerland to answer to the United States, and the United States in no way "controls" the SCA's response. Two sovereign nations have agreed by this Treaty that they will "assist" each other, but the SEC and DOJ have not established that a foreign country *in lieu of* the U.S. could provide the due process that these citizens are entitled to when their own government takes action against them. Accordingly, the Court rejects this argument and finds that defendants violated plaintiffs' Fifth Amendment right of due process by failing to give them notice of and a hearing on the Treaty request. The Court further finds that the Treaty's failure to require U.S. officials to notify citizens of a request made thereunder and to provide a prompt postdeprivation hearing violates their right to due process and is in this respect unconstitutional. Colello and Romano are thus entitled to summary adjudication on this issue.

### 3. *Unreasonable Seizure*

Plaintiffs contend that the Swiss asset freeze constitutes a "seizure" within the

---

15. *See Barr,* 819 F.2d at 27.

meaning of the Fourth Amendment, and that defendants' failure to obtain a warrant renders the asset freeze "per se unreasonable." Both the Commission and Justice agree that the asset freeze was in fact a "seizure." The Government argues that the seizure was reasonable and therefore not a violation of the Fourth Amendment.

The Fourth Amendment to the U.S. Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interest in that property." *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). And "seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place." *Soldal v. Cook County, Illinois,* 506 U.S. 56, 113 S.Ct. 538, 547, 121 L.Ed.2d 450 (1992).

■ As the Eighth Circuit explained: "The reasonableness standard of the Fourth Amendment applies to any seizure by the government in any context." *Coleman v. Watt,* 40 F.3d 255, 263 (8th Cir.1994) (*citing Soldal,* 40 F.3d at 543–48). To obtain a warrant, of course, the government must have probable cause. When proceeding without a warrant, as here, the government's "conduct is governed by the other half of the Fourth Amendment, which declares the right of the people to be secure 'against unreasonable searches and seizures.' But it is clear that such an arrest or search is unreasonable if not based upon probable cause[.]" 1 LaFave and Israel, *Criminal Procedure* (1984), § 3.3, p. 184; *see also Arizona v. Hicks,* 480

U.S. 321, 327, 107 S.Ct. 1149, 1153–54, 94 L.Ed.2d 347 (1987) ("Dispensing with the need for a warrant is worlds apart from permitting a lesser standard of cause for the seizure than a warrant would require, i.e., the standard of probable cause.")

The Ninth Circuit has explained that "[c]onclusive evidence of guilt is not necessary to establish probable cause. Mere suspicion, common rumor, or even strong reason to suspect are not enough, however." *McKenzie v. Lamb,* 738 F.2d 1005, 1008 (9th Cir.1984). The Supreme Court has required "some objective evidence which would allow a reasonable officer to deduce that a particular individual has committed or is in the process of committing a criminal offense." *Id.; accord, Gasho v. United States,* 39 F.3d 1420, 1428 (9th Cir.1994).

■ The Treaty provides for mutual assistance between Switzerland and this country based on "reasonable suspicion," *not* probable cause. The Technical Analysis establishes that the parties intended to substitute the lower standard for the higher probable cause requirement. The Commission and DOJ argue that the Treaty's reasonable suspicion standard passes Constitutional muster because: (1) the plaintiffs, in effect, "assumed the risk" of depositing their money in a foreign country, (2) "traditional domestic investigatory methods" are relatively ineffective abroad,[16] and (3) the public interest in combatting international crime and maintaining the integrity of U.S. securities markets justifies the lesser standard. Although the latter two justifications derive from serious, urgent, and complex challenges facing law enforcement agencies in the late 20th century, they do not permit circumvention of the constitutional limitation on governmental power by treaty where legislation could not accomplish the same objective. *In re Aircrash in Bali,* 684 F.2d at 1309.

■ The Government's first argument— that by placing their assets abroad, plaintiffs (U.S. citizens) are not entitled to the full

---

**16.** Defendants do not distinguish between methods and standards. That is, no one takes issue with the necessity of a treaty to facilitate evidence-gathering and, where appropriate, preservation of assets. The dispute here concerns the substitution of the probable cause standard our Supreme Court has held applies to warrantless seizures of property with the less rigorous reasonable suspicion standard.

panoply of Constitutional rights—was rejected long ago. The Bill of Rights unquestionably protects a citizen or his property from incursions by the U.S. government regardless of location. In *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), the Supreme Court explained:

> At the beginning we reject the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights. The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution. When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land. This is not a novel concept. To the contrary, it is as old as government. It was recognized long before Paul successfully invoked his right as a Roman citizen to be tried in strict accordance with Roman law.

354 U.S. at 5–6, 77 S.Ct. at 1225. *See also, Rosado v. Civiletti*, 621 F.2d 1179, 1189 (2d Cir.), *cert. denied*, 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980); *United States v. Conroy*, 589 F.2d 1258, 1264 (5th Cir.), *cert. denied*, 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979); *Powell v. Zuckert*, 366 F.2d 634, 640 (D.C.Cir.1966). The Supreme Court in *Reid* rejected the suggestion that only "fundamental" constitutional rights protect citizens abroad: "we can find no warrant, in logic or otherwise, for picking and choosing among the remarkable collection of 'Thou shalt nots' which were explicitly fastened on all departments and agencies of the Federal Government by the Constitution and its Amendments." 354 U.S. at 8–9, 77 S.Ct. at 1226.

■■■ Defendants have supplied no authority to support the notion that the Government can circumscribe or limit the entitlement of citizens to constitutional rights via a treaty, although the Court expressly requested supplemental briefing on this point.[17] A century ago, the Supreme Court observed that there is no limit on "the questions which can be adjusted touching any matter which is properly the subject of negotiation with a foreign country." *Geofroy v. Riggs*, 133 U.S. 258, 267, 10 S.Ct. 295, 297, 33 L.Ed. 642 (1890). But the treaty power does not "extend[ ] so far as to authorize what the constitution forbids[.]" *Id.; see also Asakura v. City of Seattle*, 265 U.S. 332, 341, 44 S.Ct. 515, 516, 68 L.Ed. 1041 (1924). As Justice Black stated in *Reid:*

> The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefit of a written Constitution and undermine the basis of our government. If our foreign commitments become of such nature that the Government can no longer satisfactorily operate within the bounds laid down by the Constitution, that instrument can be amended by the method which it prescribes. But we have no authority, or inclination, to read exceptions into it which are not there.

354 U.S. at 14, 77 S.Ct. at 1229.

■■■ As a result, the fact that the government complies with the literal terms

---

17. Extradition cases may be distinguished from the circumstances here on two grounds. First, the basis for the asset freeze is a purported violation of U.S., not Swiss, law. The Supreme Court has explained that "[U.S.] citizenship does not give him an immunity to commit crime in other countries, nor entitle him to demand, of right, a trial in any other mode than that allowed to its own people by the country whose laws he has violated and from whose justice he has fled." *Neely v. Henkel*, 180 U.S. 109, 123, 21 S.Ct. 302, 307, 45 L.Ed. 448 (1901). It makes sense that when a U.S. citizen violates another nation's laws, that nation's procedures for prosecuting alleged violations apply. Conversely, when an American citizen is charged with violating American laws and potentially faces prosecution in American courts, then U.S. procedures, including applicable Constitutional guarantees, apply.

The other reason why extradition cases do not support defendants' arguments here is that, as the Supreme Court remarked in *Neely*, a U.S. citizen can be extradited *only* by court order and then *only* upon probable cause. *Id.; see also Lobue v. Christopher*, 893 F.Supp. 65 (D.D.C. 1995). Neither, of course, is required by the Treaty.

of a treaty will not validate an otherwise unconstitutional search or seizure. *See Powell v. Zuckert,* 125 U.S.App.D.C. 55, 366 F.2d 634, 640 (1966), *quoting Reid,* 354 U.S. at 16, 77 S.Ct. at 1230 ("no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution.") And the fact that Swiss, not American, officials actually ordered plaintiffs' accounts frozen does not negate defendants' responsibility. *See Barr v. United States Department of Justice,* 819 F.2d 25, 27 (2d Cir.1987) ("agency principles ... apply in this case and require attribution to the American government of those actions that the Swiss government carried out at its request.") The executive cannot eliminate plaintiffs' Fourth Amendment right to be free of unreasonable seizures by treaty. The Court hereby finds that the Treaty's reasonable suspicion standard for the freeze of a U.S. citizen's assets located in Switzerland violates the Fourth Amendment. Colello and Romano are entitled to summary adjudication on this issue.

## IV.

### *CONCLUSION*

For the reasons set forth above, the Court hereby grants plaintiffs' motion for summary adjudication on the grounds that their Fifth Amendment rights to due process and their Fourth Amendment right to be protected from unreasonable seizures were violated by the freeze of their Swiss assets. Defendants' motions, with the exception of the individual defendants' motions on immunity and personal jurisdiction that were granted at the hearing, are denied.

IT IS SO ORDERED.