Robert Kent **ANDREWS** and Jones **Andrews, Plaintiffs,**

v.

Robert W. **CRUMP, et al., Defendants.**

No. 5:94CV101–McK.

United States District Court,
W.D. North Carolina,
Statesville Division.

Oct. 16, 1996.

Harold J. Bender, Charlotte, NC, James F. Wyatt, III, Charlotte, NC, for Plaintiffs.

Christopher E. Allen, Associate Attorney General, North Carolina Dept. of Justice, Raleigh, NC, for Defendants.

## MEMORANDUM OF DECISION

McKNIGHT, United States Magistrate Judge.

THIS MATTER comes before the undersigned United States magistrate judge pursuant to 28 U.S.C. § 636(c) to consider Defendants' motion for summary judgment as to Plaintiffs' claims under 42 U.S.C. § 1983 and state law. Having carefully considered all submissions of the parties, including transcripts, affidavits, briefs, and cases cited, the undersigned concludes, for the following reasons, that Defendants are entitled to qualified immunity, and to summary judgment on that ground, as to Plaintiffs' Section 1983 claims, which are the basis of the court's original jurisdiction, and that Plaintiffs' state law claims in turn should be dismissed without prejudice.

## I. FACTUAL BACKGROUND

The following account, for summary judgment purposes, is drawn from undisputed facts and Plaintiff's version of disputed facts, as supported by depositions and affidavits.

In mid–July, 1992, the United States Drug Enforcement Administration ("DEA") infiltrated a drug transportation organization in El Paso, Texas, and allowed two cooperating individuals to transport a shipment of marijuana in a tractor-trailer from Texas to North Carolina. Deposition of John Boone ("Boone Dep.") at 11–12. On July 15, 1992, DEA agents contacted Jeff Sellers, a Special Agent with the North Carolina State Bureau of Investigation ("SBI"), and asked for the SBI's assistance. Deposition of Jeff Sellers ("Sellers Dep.") at 8–11. In turn, SBI agents contacted Allegheny County Sheriff J. Michael Caudill, requesting his assistance. Deposition of J. Michael Caudill ("Caudill Dep.") at 11–15. At all relevant times, government agents had control of the marijuana. (Sellers Dep. at 10; Boone Dep. at 12.)

When the shipment arrived in the area of Sparta, North Carolina, on the night of July 16–17, 1992, federal and state agents monitored a meeting between Steven Shew, Donnie McLamb, John Norris and the informants driving the truck. Sellers Dep. at 11–14. The tractor-trailer truck containing the marijuana and a pick-up truck carrying Norris, McLamb, and Shew left this meeting and drove to a remote area in Allegheny County, which was later identified as a farm belonging to the Plaintiffs. Boone Dep. at 13–14. The tractor-trailer truck backed up to a barn on the farm, and the marijuana was unloaded. Law enforcement officers established surveillance points around the area. Boone Dep. at 14.

During this surveillance, a 1986 Honda motor vehicle was driven by a white male wearing glasses around the area from where law enforcement officers were observing the unloading of the marijuana. The vehicle made a circle around the law enforcement officers and then left, Boone Dep. at 14–15; Sellers Dep. at 21–22, proceeding in a direction away from the Andrews farm. Boone Dep. at 15.[1] Sellers stated that Agent Giles Berrier recorded in his notes that the vehicle appeared to pick up another individual, who was wearing a white ball cap, "near the barns there" and to return, passing by the surveillance team and continuing on down the road. Sellers Dep. at 22. Law enforcement officers ran a license tag check on the car, which showed that it was registered to Bonnie Andrews, the recently-separated wife of Plaintiff Robert Andrews. Sellers Dep. at 25–26.

John Norris entered a car and left the area around the barn. The decision was made to stop Mr. Norris' car, and he was arrested. Boone Dep. at 15. At that point, law enforcement officers proceeded toward the barn into which the marijuana was being offloaded. Arriving at the barn, and prior to looking into the barn or making any arrest, Sheriff Caudill and Carlton Edwards, one of his deputies, spoke with Shew, who was outside the barn. Boone Dep. at 16; Caudill Dep. at 18–19. Shew told them he was trying to work a little bit and that he had leased the farm from Robert Andrews.[2] Caudill Dep. at 19–20. Sheriff Caudill then asked if he could look around, and Shew responded that "you just do what you goddamn have to do." Caudill Dep. at 20–21. Looking into the barn, Sheriff Caudill and Officer Edwards saw Donnie McLamb and a large amount of marijuana in bales. Caudill Dep. at 21–23. Shew and McLamb were then arrested. Caudill Dep. at 23.

Having arrested Shew and McLamb, Sheriff Caudill with other law enforcement officers went to the house of Jones Andrews and told him he was needed at the barn. Caudill Dep. at 26–27. Jones Andrews' house is not within sight of the barn. Affidavit of Jones Andrews ("Jones Andrews Aff.") at ¶ 4. Jones Andrews denied having any knowledge of the marijuana off-loading or the leasing of the barn. Caudill Dep. at 27–28; Jones Andrews Aff. at ¶ 5.

---

1. Agent Sellers stated that the Honda left their position and drove in the direction of Robert Andrews' house, and that there were no other houses in the area. Sellers Dep. at 72.

2. Shew said three times during this conversation that he had leased the property from Robert Andrews. Caudill Dep. at 24.

Sheriff Caudill and Jones Andrews, along with law enforcement officers, then went to Robert Andrews' residence, which is between a mile and three-quarters and two miles from the barn in question and not within sight of this barn. Caudill Dep. at 28; Boone Dep. at 19. When the doorbell was rung, Robert Andrews appeared and was dressed. Caudill Dep. at 29.[3] Robert Andrews explained that he was dressed at this time (approximately 2:00 a.m.) because he had fallen asleep while watching television and waiting for a friend to visit.[4] Sellers Dep. at 34–35; *compare*, Affidavit of Robert Andrews ("Robert Andrews Aff.") at ¶ 3. Officer Sellers observed the 1986 Honda that had earlier been driven around the watching officers now parked by the house. He asked Robert Andrews about the vehicle, and Andrews explained that his 15–year–old son had been out driving earlier that night and had told him that he had seen some vehicles on the farm, who he assumed were driven by individuals who were fox hunting.[5] Sellers Dep. at 34–35; Affidavit of Joseph K. Andrews ("Joseph Andrews Aff.") at ¶¶ 2–4. Robert Andrews denied any knowledge of illegal use of the property and denied having leased the barn to Shew. Sellers Dep. at 36; Caudill Dep. at 31; Robert Andrews Aff. at ¶¶ 2,4.

During the morning of July 17, 1992, Sheriff Caudill contacted Defendant R. A. Hughes and told him that a large amount of marijuana had been seized. Caudill Dep. at 32–33; Deposition of R. A. Hughes ("Hughes Dep.") at 10. Hughes drove to the site and discussed the situation with Agent Sellers. Sellers Dep. at 39–40.

Sellers "basically just gave [Hughes] a synopsis of what had transpired in the past 24 to 36 hours." Sellers Dep. at 40. The synopsis included the driving by of the 1986 Honda vehicle, the interviews of Jones and Robert Andrews, and, most likely, the statement made by Shew about leasing the barn. Sellers Dep. at 40–43; Hughes Dep. at 21–23. In another discussion a day or so later, Sellers and Hughes discussed probable cause in connection with Robert Andrews.

Later, law enforcement officers at the scene discussed whether Robert Andrews could be arrested in connection with the drug off-loading, but concluded that there was no probable cause to arrest either Jones Andrews or Robert Andrews. Sellers Dep. at 46–48. Sellers told Hughes that in the opinion of the law enforcement officers at the scene, there was not probable cause to arrest Robert or Jones Andrews in connection with the marijuana. Sellers Dep. at 48.[6] (Sheriff Caudill, testified that he told Hughes that "Bobby probably knew about it," Caudill Dep. at 59–60. The deposition does not clearly establish the time of this conversation, but seem to place it at or near the time of Hughes' initial inquiry. *Id.*)

Hughes decided to confer with his office in Raleigh before taking further action. Hughes Dep. at 20. The next day, after going home and sleeping, he contacted Defendant Crump. Hughes Dep. at 28–29. Hughes and Crump discussed the quantity of marijuana unloaded on the Andrews' farm, the statement by Shew about leasing the barn, the appearance of the 1986 Honda vehicle, Robert Andrews' being fully dressed and apparently nervous when law enforcement

---

3. Caudill described Robert Andrews' appearance at the door as follows:

> Rung the doorbell, and he just appeared. I mean, he was there hanging on the—it seemed like he was just on the door. The minute the doorbell rang, he was at the door, fully clothed. By my estimation, wide awake.

Caudill Dep. at 29.

4. The record makes no mention of any attempt by the officers to determine the identity of the "friend" to whom Robert Andrews referred.

5. The record does not show that officers questioned the son.

6. Asked about this discussion, Sellers recounted it as follows:

> I don't remember much about it, but there was an agreement reached that we didn't feel that we probably had probable cause to arrest Robert Jones. We felt that he may have had constructive possession of the marijuana based on his vehicle being there that night, him possibly having knowledge that a shipment was coming in and being unloaded there, based on what Mr. Shew had said. And for that reason, a BD–4 was drawn up and assessed for him, based on his possible constructive possession.

Sellers Dep. at 47–48.

officers talked with him, and that some farm equipment had been moved out of the barn contrary to custom. Hughes Dep. at 30–31; Deposition of Robert W. Crump ("Crump Dep.") at 28–29. Having heard Hughes' account of the situation, Crump did not respond immediately as to whether or not an assessment should be made. Hughes Dep. at 31; Crump Dep. at 27. At first, Hughes and Crump decided not to issue a tax assessment against Robert Andrews. Crump Dep. at 27. Later, Crump contacted Hughes and told him that he thought a viable assessment against Robert Andrews could be made and authorized Hughes' making such an assessment. Hughes Dep. at 31–32; Crump Dep. at 33–35. Both Hughes and Crump were aware that Robert Andrews was not arrested in connection with the marijuana. Hughes Dep. at 35.

Shortly after the offloading, Sheriff Caudill interviewed Robert and Jones Andrews in his office. Hughes was present for the meeting. Caudill Dep. at 47–48. At this meeting, both Robert and Jones Andrews denied having given permission to anyone to use the farm or having rented it to them. Jones Andrews explained that he had moved a truck out of the barn two days before the offloading. Hughes Dep. at 40; Andrews Aff. at ¶ 5; Jones Aff. at ¶ 6. At the interview, Hughes told the Plaintiffs that he was "on the knife's edge" as to whether to issue the assessment. Hughes Dep. at 45. Moreover, Hughes told the Plaintiffs that he did not need any reason to issue an assessment and that he was the best revenue agent in the State. Jones Andrews Aff. at ¶ 6; Robert Andrews Aff. at ¶ 5.

Hughes did not interview any other witnesses. He did not interview Joseph Andrews, who drove the 1986 Honda. Hughes Dep. at 42; Affidavit of Joseph Andrews ("Andrews Aff. ") at ¶ 6.

On July 21, 1992, Agent Sellers prepared a Form BD–4 ("Report of Arrest and/or Seizure Involving Nontaxpaid (Unstamped) Controlled Substances and Counterfeit Controlled Substances") regarding Robert Kent Andrews. Sellers Dep. at 51–52; Form BD–4, Sellers Dep. Exh. 1. This document names Robert Andrews as the person arrested in possession of the controlled substance. (Sellers, Hughes, and Crump each knew that Robert Andrews had not been arrested. Sellers Dep. at 52; Crump Dep. at 41.) There was no time deadline before which Form BD–4 was required to be filled out and submitted. Sellers Dep. at 68.

Hughes testified in deposition that he had sufficient opportunity to investigate the matter as thoroughly as he felt appropriate. Hughes Dep. at 80. After the BD–4 Form had been completed, Hughes prepared a Notice of Controlled Substance Tax Assessment, Form BD–10, for Robert Andrews, dated July 21, 1992, assessing him with a Controlled Substance Tax in the amount of $6,371,673.84 based upon 2,000 pounds of marijuana. Hughes Dep. at 35–36, Plaintiff's Exh. 2.[7] In addition, Hughes prepared a Certificate of Tax Liability in the amount of $6,371,673.84 ("Form DOR–40") as to Robert Andrews, which he then served on Andrews and recorded with the Alleghany County Register of Deeds. Hughes Dep. at 36–42, 49, Plaintiffs' Exh. 3.[8] The Alleghany County Certificate of Tax Liability is file stamped July 22, 1992. Approximately two weeks

---

7. Form BD–10 states that the assessment is proposed pursuant to G.S. 105–113.111, that a hearing before the Secretary of Revenue regarding the assessment can be requested in writing within thirty days pursuant to G.S. 105–241.1, and that unless the assessment is paid or a bond is posted, collection may proceed pursuant to G.S. 105–241.1(g) or G.S. 105–242 without regard to whether a hearing was requested.

8. The Certificate of Tax Liability certifies that Robert Kent Andrews "is indebted to the State of North Carolina on account of duly assessed and delinquent taxes, penalties and interest ..." It further states:

You, therefore [Clerk of Superior Court], are hereby directed and required to docket and cross-index this certificate in your records as a judgment against said tax debtor, pursuant to the provisions of G.S. 105–242; and thereupon it shall take effect, be enforceable, and bear interest from the date hereof, the same as any other duly docketed and indexed judgment of your court.

Plaintiffs' Exh. 3 to Hughes Dep., Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment at Tab 9.

later, Hughes filed the Certificate of Tax Liability in Surry County as well. Hughes Dep. at 52.

At the time he filed the Certificates of Tax Liability, Hughes knew that Jones and Robert Andrews were in the Christmas tree farm business. Hughes Dep. at 99. Hughes knew that filing the Certificates of Tax Liability would impede the Andrews' use of the property subject thereto. In his deposition, Hughes stated the following:

Q. Now, after you went to Mr. Doughton's office, you went and filed the Certificate of Tax Liability, Plaintiff's [sic] Exhibit Number 3?

A. Yes, sir.

Q. And where did you file that?

A. In the Clerk of Superior Court's Office in Alleghany County.

Q. All right. And what does that document do? What's your understanding of what it does?

A. That document is a lien against property of the taxpayer, real property.

Q. Okay. It would prevent the taxpayer from being able to sell that property without the resolution of the lien?

A. Without the resolution of the lien. The lien would have to either be paid off or some resolution made.

Q. If there were no ability to resolve that lien, it would effectively freeze the property from being sold?

A. Yes, sir.

MR. ALLEN: Could I interject one comment? This is not the nature of an objection but just a point of clarification. The Secretary does have discretion to release a lien, if it's shown that it's in the best interest of the State to do so. So the property could be sold. The Secretary could release the lien with respect to one tract of property, although that CTL would be valid against all the other property in the county. I just wanted to make sure that's a point of law that's clarified.

MR. WYATT: Certainly.

BY MR. WYATT:

Q. Let me just rephrase my question. Without the consent of the Secretary's Of-fice, this document would effectively freeze the sale of the property?

A. Right.

Q. Unless the lien was paid off?

A. Right. There would have to be a release, which has been done. I've done it in a couple of cases.

Hughes Dep. at 48–49. Later, Hughes testified:

Q. Now, did you have any knowledge whatsoever about the Andrews' mortgage situation when you filed the tax assessment?

A. No, sir.

Q. Okay. Did you know that they were engaged in the Christmas tree farm business?

A. Among other things, yes, sir, I understood that.

Q. And how did you learn that information?

A. It was common knowledge in Sparta.

Q. Okay. Do you usually make any investigation with regard to mortgage information before filing an assessment?

A. No, sir.

Q. Why is that?

A. Well, because the filing of the tax lien against the person, we don't throw them out of the house or anything like that, and they end up in control of this property and have control of it, and especially if they object or whatever and they're—as long as they're paying their mortgage and all like that, we don't bother them on that. And so—and the—most of the time, it has no effect on me whatsoever as to whether there's a mortgage or not. It's up to the taxpayer as to whether they pay it or not, because we haven't taken actual possession of the property. It's not ours.

Q. When you filed the assessment against Robert Andrews, you knew that it would essentially tie up his property until this—until the issue of the tax lien and tax assessment was resolved?

A. Well, I knew that he could not dispose of the property. He personally wouldn't receive any benefits from it.

Q. Okay. Now the bond that has to be posted when there is a tax assessment is an amount equal to the tax assessment? A. It's been a long time since I've been through that, but I don't know that it's ever been done but one time. But I do believe that's correct.

Hughes Dep. at 99–100.

Hughes knew when he filed the Certificates of Tax Liability that the real property was owned jointly by Jones and Robert Andrews. Hughes Dep. at 93. In his deposition, Crump states that it is "entirely likely" that the Andrews' attorney, Harold Bender, told him that there was an urgency to get the lien off of the land because it was Christmas tree land and Christmas tree selling season was not long off. Crump Dep. at 45. On November 12, 1992, Bender wrote to Crump requesting prompt consideration. Plaintiffs' Exh. 11 to Crump Dep.[9]

As a result of the filing of the Certificates of Tax Liability, Plaintiffs were unable to harvest Christmas trees from the property. Robert Andrews Aff. at ¶ 8; Jones Andrews Aff. at ¶ 8. They depended on income from tree sales to pay their debts on these properties:

8. Because of the filing of Certificates of Tax Liability, prior to my filing of bankruptcy protection, we were unable to harvest the Christmas trees during the fall and winter of 1992. The filing of the Certificates of Tax Liability effectively froze the property and prevented us from receiving the normal income from these properties. I was dependent on the income from harvesting Christmas trees in order to make payments on indebtedness on the property. As a result of the filing of the Certificates of Tax Liability, I was unable to make payments on this indebtedness. Because of the filing of the Certificates of Tax Liability and resulting loss of income,

I was forced to seek bankruptcy protection on October 23, 1992.

Robert Andrews Aff. at ¶ 8.

8. As a result of the filing of the Certificates of Tax Liability in Alleghany and Surry Counties by Hughes and Crump, the Christmas tree land owned by my son and me was effectively frozen. Specifically, prior to my son's filing for bankruptcy protection, we were not able to harvest any Christmas trees off of our property. We were dependent on the income from the harvesting of Christmas trees in order to make payments on the indebtedness on the property. My son and I tried to obtain additional loans, but because of the presence of the Certificates of Tax Liability on the public records, we could not obtain any loans.

9. As a result of the filing of the Certificates of Tax Liability, I was forced to file for bankruptcy protection on April 22, 1993. Prior to my filing for bankruptcy protection, the Certificates of Tax Liability were removed on March 26, 1993. However, the removal of these Certificates came at too late at [sic] time for me to be able to avoid bankruptcy because we were unable to harvest Christmas trees during the 1992 Christmas tree season.

Jones Andrews Aff. at ¶¶ 8, 9.

After the assessment had been issued, on or about August 3, 1992, Bender filed an "Objection to Assessment and Application for Hearing". Crump Dep. at 42, Plaintiffs' Exh. 9. On September 11, 1992, Bender and Robert Andrews met with Crump for a prehearing conference. Plaintiffs' Exh. 11 to Crump Dep. After meeting with Bender, Crump attempted to obtain more information. He sent a letter to the SBI requesting additional information on the transaction. Crump Dep. at 48–49. On October 12, 1992, he received a letter from SBI Special Agent

---

**9.** In the letter Bender stated:

When I urged you to make a prompt decision due to the seasonal nature of my client's business, you indicated that you would do so and were well aware of the need for resolution of this matter so that my client could sell his Christmas trees. As a direct result of the tax assessment still pending, my client has had to seek the protection of the Bankruptcy Court.

It appears to me that sixty (60) days is more than enough time to gather the information necessary from SBI agents to determine if this tax assessment is valid or not. Therefore, I request that I be furnished with any and all information provided by law enforcement agents. Further, I request that a response be made within ten (10) days of today's date.

Plaintiffs' Exh. 11 to Crump Dep. at 1.

in Charge J. S. Moiler, Jr. Crump Dep. at 50, Plaintiffs' Exh. 5 to Crump Dep. The concluding paragraph of this three-page letter states:

> Due to the facts that Shew had used the Andrews farm as a drop site for such a *large* amount of marijuana, that Andrews' vehicle was seen in the area around the barn by the surveillance teams while the marijuana was being worked in the barn, that at 2:00 a.m. in the morning when the officers spoke with Andrews that he was fully dressed and appeared to be very nervous, and that by Steve Shew's statement that he leased the barn from Robert Andrews, it is believed that Robert Andrews was a silent partner for this shipment of marijuana and supplied the drop site for Shew.

Plaintiffs' Exh. 5 to Crump Dep. at 3. Crump discussed the information in this letter with Hughes. Crump Dep. at 51.

Hughes gathered police reports for Crump in connection with deciding the merits of Bender's objection. Hughes Dep. at 60–61. During the time that he was so engaged, Hughes learned, and told Crump, that Shew had recanted his statement. *Id.*[10] Hughes told Crump he had come to believe that there was not a good case for an assessment in light of Shew's recantation and the fact that it was Robert Andrews' son who was driving the 1986 Honda. Hughes Dep. at 67–68. Crump asked Hughes to see if there were other information relevant to the assessment. Hughes investigated further and told Crump that there was no further information linking Robert Andrews with the marijuana found at the farm. Hughes Dep. at 68–69.

On January 11, 1992, Robert Andrews' attorney in the bankruptcy proceeding filed a

challenge to the tax assessment. Crump Dep. at 57; Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment at Tab 4. The challenge claimed, in part, that "[t]he DOR has encumbered all property owned by the Debtor in Alleghany County and Surry County, North Carolina in connection with the Tax"; that "[t]he Debtor was neither involved in the Transaction nor did he have prior knowledge of the Transaction"; and that "[t]he Tax is illegal and invalid and no debt is owed by the Debtor to the DOR in connection with the Tax." *Id.* Crump was notified of this challenge. He discussed it with an attorney in the Attorney General's office, and it was decided that the assessment should be cancelled. Crump Dep. at 57–59.

On February 26, 1993, the assessment still being in effect, the Bankruptcy Court entered an Order Determining Tax Liability stating that no objection to the Motion for Determination of Tax Liability was filed and that the North Carolina Department of Revenue through the North Carolina Attorney General's Office expressly consented to the relief sought. The Court found that "[t]he tax, penalty and interest assessed against the Debtor were assessed without good and valid basis in law or fact," and ordered that "[t]he DOR shall within fifteen (15) days of this Order formally withdraw its Notice of Controlled Substance Tax Assessment and shall cancel or release the Certificates of Tax Liability filed against the Debtor in Alleghany County and Surry County, North Carolina." Tab 5 to Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment.

Despite the Order of the Bankruptcy Court, the Certificates of Tax Liability were not removed until March 23, 1993, twenty-

---

**10.** After stating in deposition that he had learned of Shew's recantation from Agent Sellers, Hughes Dep. at 61, Hughes also makes reference to a statement that Shew had given to officers saying that Robert Andrews "was to be paid quite a large sum of money for the rental of this barn." Hughes Dep. at 63. Hughes states that he became aware of this statement "around November the 14th" and that he received the information from Agent John Boone. Hughes Dep. at 64.

Agent Boone stated in deposition that he first interviewed Shew in the spring of 1994 and that

Shew was cooperating with federal agents at that time. Deposition of John Boone ("Boone Dep.") at 24.

On March 30, 1995, Shew signed an affidavit stating that neither Robert nor Jones Andrews gave him permission to use the land for offloading marijuana, leased the land to him for that purpose, or were involved in the marijuana shipment. Tab # 6 to Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment.

five days after the issuance of the Order. Hughes effected the cancellation on March 23d and stated that Crump's directive to him to do so had come within forty-eight hours of March 23d. Hughes Dep. at 73–74.

## II. STANDARD FOR SUMMARY JUDGMENT

### A. GENERAL STANDARD

To grant a motion for summary judgment, a court must find that the materials submitted, including the pleadings, depositions, answers to interrogatories, admissions and affidavits, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of fact is one which "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *see, White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98, 101 (4th Cir.1987) ("There is no genuine issue for trial unless sufficient evidence favors the nonmoving party for a jury to return a verdict for that party."). To make this finding, a court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985).

The movant has the burden of showing the absence of any genuine issue as to a material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). When the moving party does not bear the burden of proof at trial, its burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corporation v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–2554, 91 L.Ed.2d 265 (1986). Justice White warns, however, that "[i]t is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case." *Id.* at 328, 106 S.Ct. at 2555. What showing of evidence by the movant is sufficient for summary judgment depends upon the basis of the motion:

> If the motion asserts that the opponent lacks proof to establish a requisite element of its case, as in *Celotex,* the movant must show the absence of facts, usually by producing relevant excerpts from the opponent's discovery responses, supplemented as needed by affidavits. If the motion purports to negate an essential element of the nonmovant's case, for example, to establish that no reasonable jury could return a verdict for the nonmovant, a more elaborate showing on affidavits may be necessary.

Schwarzer, Hirsch & Barrans, THE ANALYSIS AND DECISION OF SUMMARY JUDGMENT MOTIONS (Federal Judicial Center 1991), at 46.

Rule 56(e) requires that the party resisting summary judgment go beyond pleadings and designate "specific facts showing that there is a genuine issue for trial." Rule 56(e) also requires that "affidavits set forth facts as would be admissible in evidence." In a case where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'," and summary judgment is proper. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–1593, 20 L.Ed.2d 569 (1968)). Justice White, writing for the majority, stated in *Anderson:*

> [S]ummary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. ... [T]here is no issue for trial, [however], unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

· · ·

The mere existence of a scintilla of evidence in support of the plaintiff's position

will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

477 U.S. at 248–252, 106 S.Ct. at 2510–2512.

Dismissing a fraud claim in 1988, Judge Robert D. Potter phrased the standard for prevailing on summary judgment: "[I]t must be apparent on summary judgment that plaintiff will be unable to present evidence at trial sufficient to allow a *reasonable jury* to find that plaintiff has proved his case *by a preponderance.*" *Wilson v. Popp Yarn Corp.*, 680 F.Supp. 208, 210 (W.D.N.C.1988) (emphasis added).

Characterizing the genuineness standard, Judge Wilkinson wrote for the Fourth Circuit:

> Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds would recognize as real factual disputes.

*Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985), *quoted in Catawba Indian Tribe v. State of South Carolina*, 978 F.2d 1334, 1339 (4th Cir.1992).

Credibility is not an issue for summary judgment. Therefore, the nonmovant's evidence must be accepted as true for purposes of the motion. When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. *Davis v. Zahradnick*, 600 F.2d 458 (4th Cir. 1979).

The underlying facts and contentions will be viewed in a light most favorable to the nonmovant. [T]he court is obliged to credit the factual asseverations contained in the material before it which favor the party resisting summary judgment and to draw inferences favorable to that party if the inferences are reasonable (however improbable they may seem). *Cole v. Cole*, 633 F.2d 1083, 1092 (4th Cir.1980).

## B. QUALIFIED IMMUNITY AND SUMMARY JUDGMENT

In *Pittman v. Nelms*, 87 F.3d 116 (4th Cir.1996), the Fourth Circuit Court of Appeals set forth the pattern of analysis for qualified immunity at the summary judgment stage. The Court stated that "the accepted summary judgment analysis is a condensed version of the full analysis," 87 F.3d at 119 n. 2, and developed that analysis as follows:

> A qualified immunity case must develop through two primary levels. The first does not involve immunity at all, but focuses on the merits of the plaintiff's claim— whether the defendant's conduct violated a constitutional right of the plaintiff. It includes the factual issue of what actually happened, ..., and the legal question of whether the defendant's actions were unconstitutional. ....
>
> Only if the defendant did act illegally must the case proceed to the second level to determine whether he is, nevertheless, immune from suit. .... The immunity level consists of two sub-issues—whether the law governing the violation was clearly established at the time of the incident, ..., and whether a reasonable person in the defendant's position should have known that his conduct was illegal, .... Both are issues of law for the court:
>
>> Only if a court determines that the plaintiff has alleged a violation of a right clearly established at the time the actions occurred should it proceed to determine whether a reasonable person in the official's position would have known that his actions violated that right. When the inquiry proceeds to this point, "the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct," ...; however, the defendant may still be able to show "extraordinary circumstances" and "prove that he neither knew nor should have known of the relevant legal standard." ....
>> Since such a claim would turn "primarily on objective factors," ..., this determination, too, is "also a matter for the courts," ....
>
> Policy considerations favor deciding qualified immunity at the summary judgment stage:
>
>> One of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but un-

warranted demands customarily imposed upon those defending a long drawn out lawsuit.

.... When a court addresses qualified immunity in the summary judgment context, it can condense its analysis. As with any motion for summary judgment, it must view the evidence in the light most favorable to the non movant, so it need not make factual findings. Nor must it determine directly whether the plaintiff's evidence indicates a constitutional violation. Instead it can combine the second prong of the immunity inquiry by asking whether the plaintiff has "allege [d] the violation of a clearly established right.".... If the answer is affirmative, the court must determine whether the defendant "knew or should have known" that his conduct was illegal. ....

*Pittman*, 87 F.3d at 118–119 (case citations omitted).

## III. QUALIFIED IMMUNITY

### A. QUALIFIED IMMUNITY AS TO SEIZURE. (COUNT ONE: THAT DEFENDANTS CRUMP AND HUGHES SEIZED THE PLAINTIFFS' PROPERTY WITHOUT ANY BASIS FOR DOING SO, IN VIOLATION OF THE FOURTH AMENDMENT.) WHETHER THE RIGHT ALLEGEDLY VIOLATED WAS CLEARLY ESTABLISHED

■ What is "clearly established" must be tied to the facts of the particular case. It is not sufficient to articulate a right in broad, general terms without concrete application. In *Gooden v. Howard County, Md.*, 954 F.2d 960 (4th Cir.1992), the Fourth Circuit stated in this regard:

However, "if the test of 'clearly established law' were to be applied at this level of generality,.... [p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability" *Anderson* [*v. Creighton* ], 483 U.S. [635] at 639, 107 S.Ct. [3034,] at 3039[, 97 L.Ed.2d 523 (1987)]. Instead, for an official to lose his qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates

that right." *Id.* at 640, 107 S.Ct. at 3039. "*Harlow's* 'clearly established' standard demands that a bright line be crossed." *Barts v. Joyner*, 865 F.2d 1187, 1194 (11th Cir.1989). "The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful." *Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir.1986). Of course, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039 (citations omitted).

954 F.2d at 968. The standard was further developed in *Pritchett v. Alford*, 973 F.2d 307 (4th Cir.1992):

In determining whether the specific right allegedly violated was "clearly established," the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged. *Anderson*, 483 U.S. at 639–40, 107 S.Ct. at 3039; *Tarantino v. Baker*, 825 F.2d 772, 774–75 (4th Cir.1987). And the determination whether a reasonable person in the officer's position would have known that his conduct would violate the right at issue must be made on the basis of information actually possessed by the officer at the critical time, *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039–40, or that was then reasonably available to him, *Harlow* [*v. Fitzgerald*], 457 U.S. [800] at 815[, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982)]; *Sevigny v. Dicksey*, 846 F.2d 953, 957 n. 5 (4th Cir.1988), and in light of any exigencies of time and circumstance that reasonably may have affected the officer's perceptions. *See, Malley v. Briggs*, 475 U.S. 335, 350, 106 S.Ct. 1092, 1100–01, 89 L.Ed.2d 271 (1986) (Powell, J., concurring in part and dissenting in part). The tolerance thus accorded by the qualified immunity defense to "good faith" mistakes of judgment traceable to unsettled law, or faulty information, or contextual exigencies, is deliberately designed to give protection to "all but the plainly incompetent

or those who knowingly violate the law," *Malley,* 475 U.S. at 341, 106 S.Ct. at 1096, in order to avoid undue inhibitions in the performance of official duties. *Anderson,* 483 U.S. at 638, 107 S.Ct. at 3038.

973 F.2d at 312.

With respect to the case at hand, in order to assess the potential civil liability of these state actors under § 1983, we ask whether Plaintiffs have properly asserted a violation of a clearly established right arising under either the Constitution or a federal statute. It is beyond cavil that Plaintiffs enjoyed the Fourth Amendment right to be free from unreasonable seizures. To be decided is whether that right was clearly established in reference to the specific conduct being challenged, that is, whether filing these Certificates of Tax Liability constituted an unreasonable seizure under the Fourth Amendment. The Fourth Amendment, made applicable to the States by the Fourteenth, *Ker v. California,* 374 U.S. 23, 30, 83 S.Ct. 1623, 1628, 10 L.Ed.2d 726 (1963), provides in pertinent part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." The Fourth Amendment is violated if there is a seizure which is outside the parameters of Fourth Amendment reasonableness, an objective standard, with the requisite level of intent. At issue in this case is whether there was a seizure and, if so, whether it was reasonable.

The tax assessment was imposed pursuant to N.C.G.S. § 105–113.111, which provided in part as follows:

Notwithstanding any other provision of law, an assessment against a dealer who possesses a controlled substance to which a stamp has not been affixed as required by this Article shall be made as provided in this section. The Secretary shall assess a tax, applicable penalties, and interest based on personal knowledge or information available to the Secretary. The Secretary shall notify the dealer in writing of the amount of the tax, penalty, and interest due, and demand its immediate payment. . . . If the dealer does not pay the tax, penalty, and interest immediately upon receipt of the notice and demand, the Secretary shall collect the tax, penalty, and interest pursuant to the procedure set forth in G.S. 105–241.1(g) for jeopardy assessments or the procedure set forth in G.S. 105–242, including causing execution to be issued immediately against the personal property of the dealer unless the dealer files with the Secretary a bond in the amount of the asserted liability for the tax, penalty, and interest. . The Secretary shall use all means available to collect the tax, penalty, and interest from any property in which the dealer has a legal, equitable, or beneficial interest. The dealer may seek review of the assessment as provided in Article 9 of this Chapter.

N.C.G.S. § 105–113.111.

A "dealer" was defined as follows:

A person who in violation of G.S. § 90–95 possesses, delivers, sells, or manufactures more than 4.25 grams of marijuana, or 7 or more grams of any other controlled substance or counterfeit controlled substance that is sold by weight, or 10 or more dosage use units of any other controlled substance or counterfeit controlled substance that is not sold by weight.

N.C.G.S. § 105–113.106(3).

The Certificate of Tax Liability prohibited an owner from delivering good title even to a subsequent bona fide purchaser of real estate:

Provided, however, that the lien of State taxes shall not be enforceable as against bona fide purchasers for value, and as against duly recorded mortgages, deeds of trust and other recorded specific liens, as to real estate, except upon docketing of a certificate of tax liability or a judgment in the office of the clerk of the superior court of the county wherein the real estate is situated . . ., and the priority of the State's tax lien against property in the hands of bona fide purchasers for value, and as against duly recorded mortgages, deeds of trust and other recorded specific liens, shall be determined by reference to the date and time of docketing of judgment or

certificate of tax liability or the levy under execution or tax warrant.

N.C.G.S. § 105–241.

It does not appear that the filing of a tax assessment under the above statutes has been held to be a "seizure" implicating the Fourth Amendment, or even that the issue has been squarely presented to North Carolina or federal courts. *See, however, State v. Ballenger*, 123 N.C.App. 179, 472 S.E.2d 572 (1996) (divided court, applying the Supreme Court's analysis in *Dept. of Rev. of Montana v. Kurth Ranch*, 511 U.S. 767, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994), to G.S. § 105–113.105 *et seq.*, holding that "the North Carolina Controlled Substance Tax does not have such fundamentally punitive characteristics as to render it violative of the prohibition against multiple punishments for the same offense contained in the Double Jeopardy Clause." *Id.* 472 S.E.2d at 575). Nor was the undersigned able to discover federal or state case authority analyzing Fourth Amendment seizure issues under relevantly similar statutes in the laws of other states. This alone might be deemed decisive as to whether the application was clearly established. But we must inquire as to whether persuasive analogies rendered the instant application apparent.

Historically, for purposes of § 1983, the Supreme Court has analyzed deprivations of liberty and property arising out of a seizure of property in terms of procedural due process rather than Fourth Amendment violations. *See, Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). This reasoning was accepted by the Seventh Circuit in *Soldal v. County of Cook*, 942 F.2d 1073 (7th Cir.1991), decided August 27, 1991, a case which, at the Circuit and Supreme Court levels, will be important for this discussion. In that opinion, the facts of which will be discussed below, Judge Posner, writing for the Court, determined that the disconnection of a mobile home from its utilities, and the towing of the home off the premises of the trailer park, did not constitute a seizure for purposes of the owners'

claim that their Fourth Amendment right against unreasonable seizures had been violated. The purpose of the actions was to evict the tenant, and there had been no previous search for evidence of crime implicating the owners' privacy rights. Judge Posner reasoned as follows:

Yet in all these cases the seizure of items that were in the public view, while lawful, was treated as a *Fourth Amendment* seizure, so that it had to be pronounced reasonable (for example because it was consented to, or supported by probable cause, or it seized something that was in plain view) before it could be permitted. The reason, however, is that seizures made in the course of investigations by police or other law enforcement officers are almost always, as in the plain view cases, the culmination of searches. The police search in order to seize, and it is the search *and ensuing seizure* that the Fourth Amendment by its reference to "searches and seizures" seeks to regulate. Seizure means one thing when it is the outcome of a search; it may mean something else when it stands apart from a search or any other investigative activity. The Fourth Amendment may still nominally apply, but, precisely because there is no invasion of privacy, the usual rules do not apply.

There is another reason for distinguishing public law enforcement from other contexts in which seizures may occur, and that is the historical connection between the Fourth Amendment and liberty. The objection to an arrest is not only that it is an invasion of privacy, but also that it is a restriction of liberty. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Some property seizures are of this character as well, such as prolonged detention of an individual's luggage at an airport, which by preventing him from going on his way curtails his liberty. *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). In none of these cases is the court concerned with property rights as such, although in some of the cases property rights get mentioned in connection with the question of standing to maintain a Fourth Amendment challenge, an issue since laid to rest by *United*

*States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). Outside of the law enforcement area the Fourth Amendment retains its force as a protection against searches, because they invade privacy. That is why we decline to confine the amendment to the law enforcement setting. But concerns of liberty will rarely be present outside of that setting and they are not in this case—which because it is a case of seizure, not search, does not involve an invasion of privacy, either.

Thus, *no* interest protected by the Fourth Amendment is involved, and this helps show that even if, despite what we have said, there is some element or tincture of a Fourth Amendment seizure, it cannot carry the day for the Soldals. *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), established the principle that the dominant character of the conduct challenged in a section 1983 case determines the constitutional standard under which it is evaluated. The narrow holding of *Graham* is that when the gist of the challenged conduct is an arrest, the Court should use the standards of the Fourth Amendment to adjudge its lawfulness even though the conduct could also be characterized as a deprivation of liberty. But the converse should also be true. If the gist of the challenged conduct is a repossession or eviction conventionally challenged under the due process clause as a deprivation, recharacterization as a Fourth Amendment seizure is barred. The suggestion that *Graham* stands for the proposition that all property disputes should so far as possible be stuffed into the Fourth Amendment strikes us as bizarre.

Mr. Soldal is neither an arrestee (so far as pertinent to this part of the case) nor a prison inmate, but the principles of *Graham v. Connor* and *Hudson v. Palmer*[, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393(1984)] sweep broader than the facts or narrow holdings, and the need to carve the joint between the Fourth Amendment and the due process clause is as urgent in this case as in an arrest case or a prisoner case. The decisions require us to mesh the different provisions in or incorporated by the Fourteenth Amendment while preserving their separate domains—and thus to make the amendment coherent. *Hudson* tells us to do so by allocating the protection of privacy to the Fourth Amendment and the protection of property to the due process clauses of the Fifth and Fourteenth Amendments. *United States v. Janik*, 723 F.2d 537 (7th Cir.1983). Mr. Soldal lost his property but not his privacy or his liberty. He has no Fourth Amendment case. He had other legal remedies but he waived them.

The paradox seemingly presented by our decision—that the law-abiding have fewer rights under the Fourth Amendment than the criminal—is superficial. Different constitutional provisions protect different interests. The Fourth Amendment protects privacy, and that interest is more likely to be infringed by criminal investigations than by other governmental activities— though the law-abiding are, occasionally, the inadvertent and, rarely, the intended targets of a criminal investigation, and when they are they receive the full protection of the amendment. The due process clause of the Fifth and Fourteenth Amendments is among the provisions that protect property (though that is not all it protects); and property interests are more likely to be asserted by the law-abiding than by the criminal class. The Soldals, to repeat, had remedies; they chose the wrong one.

942 F.2d at 1079–1080 (case citations omitted; emphasis in original).

Since *Soldal*, decided by the Seventh Circuit in 1991 and by the Supreme Court in 1992, tests the proposition that the Fourth Amendment protects against unreasonable seizures of property only where privacy or liberty is also implicated, its reasoning and holding are important for deciding the instant case; for although the filing of a lien to collect a tax implicates neither privacy nor liberty, the court is asked to hold that it was a Fourth Amendment seizure and that it was unreasonable under the parameters of Fourth Amendment reasonableness. *Soldal* asks the questions which must be asked in instant case (was there a Fourth Amendment seizure, and was it reasonable) about state interference with possessory interests where

the property was not seized as evidence of a crime. Unlike the Soldals, the Andrews were subjects of a criminal investigation, their property was searched, and the tax was assessed on the basis of the results of the criminal investigation. However, neither the privacy nor liberty interests of the Andrews was implicated in this process. The seizure of the Andrews' property, if such it was, was not a seizure of possible evidence of criminal activity but an interference, to satisfy a tax,‚ with the Andrews' ability to sell property and things attached to property. *Soldal* is persuasive in the instant case because it resolves the determining question of the instant case, whether the Fourth Amendment may apply when neither liberty nor privacy interests are brought into question by state action interfering with possessory interests.

The relevant facts in *Soldal,* as recounted in the Supreme Court opinion, *Soldal v. Cook County, Ill.,* 506 U.S. 56, 57–58, 113 S.Ct. 538, 541–542, 121 L.Ed.2d 450 (1992), are as follows. The Soldal family resided in a trailer home located on a rented lot in the Willoway Terrace mobile home park in Elk Grove, Illinois. In May, 1987, Terrace Properties, which owned the park, and Margaret Hale, its manager, filed an eviction proceeding against the Soldals in an Illinois state court. Under Illinois law, dispossession must follow a judgment of eviction. The suit was dismissed on June 2, 1987, and the owner brought a second eviction action for nonpayment of rent in August, 1987. Trial was set for September 22, 1987.

Terrace Properties and Hale did not await trial, but instead forcibly evicted the Soldals two weeks prior to September 22d. Hale notified the Cook County Sheriff's Department on September 4th that she was going to have the trailer taken out of the park. She asked for sheriff's deputies in case of resistance. Later on the 4th, two Terrace Properties employees, accompanied by Cook County Deputy Sheriff O'Neil, removed the sewer and water connections from the trailer, disconnected the telephone, tore off the canopy and skirting, and attached the trailer to a tractor. O'Neil told Soldal that "he was there to see that [Soldal] didn't interfere with [Willoway's] work."

Two more deputies arrived. Soldal asked to file a criminal trespass complaint. He was referred to Lieutenant Jones in Hale's office. Jones refused to accept the complaint because, in his opinion, it was a landlord-tenant situation. The deputies knew that Terrace Properties had not obtained an eviction order. With the deputies present, the Willoway employees pulled the trailer free and towed it to nearby property.

A state judge on September 9th found that the eviction had not been authorized and ordered the trailer, which had been badly damaged, returned to the lot. The Soldals brought a § 1983 action alleging violations of their Fourth and Fourteenth Amendment rights, and claiming that the private defendants had conspired with the deputies to unreasonably seize and remove the Soldal's trailer home. The district court granted summary judgment for failure to show a conspiracy. As we have seen, the Seventh Circuit found state action but held that the removal of the trailer was not a Fourth Amendment seizure or Fourteenth Amendment deprivation.

The Supreme Court reversed the decision of the Seventh Circuit, and its reasoning and holding informs the determination of the instant case. Delivering the opinion of the Court, Justice White reaffirmed the definition of "seizure" set forth in *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), that a seizure of property occurs "when 'there is some meaningful interference with an individual's possessory interests in that property,'" 506 U.S. at 61, 113 S.Ct. at 543, and determined by this definition that, *contrary to the Seventh Circuit's view,* the Soldal's home was seized.

Justice White stated that the Seventh Circuit's understanding of seizure followed from too narrow a reading of the Fourth Amendment. The Fourth Amendment does not protect only liberty and privacy interests "while leaving unprotected possessory interests where neither privacy nor liberty was at stake." 506 U.S. at 62, 113 S.Ct. at 543. The language of the Fourth Amendment and interpreting cases "unmistakably hold that the Amendment protects property as well as privacy." 506 U.S. at 62, 113 S.Ct. at 544.

"We are thus unconvinced that any of the Court's prior cases supports the view that the Fourth Amendment protects against unreasonable seizures of property only where privacy or liberty is also implicated." 506 U.S. at 65, 113 S.Ct. at 545. Moreover, "the Amendment's protection applies in the civil context as well." 506 U.S. at 67, 113 S.Ct. at 546.

The Court rejected the view of the Seventh Circuit, set out above, that the Amendment protects only against those unreasonable seizures that are the outcome of a search. "[O]ur cases ... hold that seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Fourth Amendment has taken place." 506 U.S. at 68, 113 S.Ct. at 547.

> In our view, the reason why an officer might enter a house or effectuate a seizure is wholly irrelevant to the threshold question of whether the Amendment applies. What matters is the intrusion on the people's security from governmental interference. Therefore, the right against unreasonable seizures would be no less transgressed if the seizure of the house was undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, or on a whim, for no reason at all.

506 U.S. at 69, 113 S.Ct. at 548.

The Court notes that Fourth Amendment reasonableness determination "will reflect a 'careful balancing of governmental and private interests'." 506 U.S. at 71, 113 S.Ct. at 549 (quoting from *New Jersey v. T.L.O.*, 469 U.S. 325, 341, 105 S.Ct. 733, 742, 83 L.Ed.2d

720 (1985)).[11] The Court implies that probable cause is the presumptive standard, at least where police are involved in a search, even in the absence of a privacy interest, as in the plain view decisions, where "[a] seizure of the article ... would obviously invade the owner's possessory interest'." 506 U.S. at 66, 113 S.Ct. at 546 (quoting from *Horton v. California*, 496 U.S. 128, 134, 110 S.Ct. 2301, 2306, 110 L.Ed.2d 112 (1990)).

■ Applying the reasoning of the Supreme Court in *Soldal*, we ask first if the filing of the certificates of tax liability was a seizure under the Fourth Amendment. Under *Soldal* and *Jacobsen*, this amounts to asking whether there was meaningful interference with the Andrews' possessory interests in their property. *Jacobsen* does not define "possessory," and the definition, in the context of the facts of *Jacobsen*, could (but not necessarily) be read as limiting the protection to interests arising out of actual physical possession, in which case it would protect the right of present use and enjoyment and the right to transfer possession, e.g., through sale or lease. *See, Steven G. Davison, WARRANTLESS INVESTIGATIVE SEIZURES OF REAL AND TANGIBLE PERSONAL PROPERTY BY LAW ENFORCEMENT OFFICERS*, 25 American Criminal Law Review 577, 587–590 (1987). Even under a restrictive reading of the definition, the right to sell property actually possessed would be protected. If filing the tax certificates meaningfully interfered with the Andrews' ability to sell their property, then under *Jacobsen* there was an interference with possessory interests.[12]

---

**11.** In *T.L.O.*, the Court discussed the determination of Fourth Amendment reasonableness in the context of a search by school officials of a student's purse:

> The school setting also requires some modification of the level of suspicion needed to justify a search. Ordinarily, a search—even one that may permissibly be carried out without a warrant—must be based upon "probable cause" to believe that a violation of the law has occurred. ... However, "probable cause" is not an irreducible requirement of a valid search. The fundamental command of the Fourth Amendment is that searches and seizures be reasonable, and although "both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a

search, ... in certain limited circumstances neither is required." ... Thus, we have in a number of cases recognized the legality of searches and seizures based on suspicions that, although "reasonable," do not rise to the level of probable cause. ... Where a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause, we have not hesitated to adopt such a standard.

469 U.S. at 340, 105 S.Ct. at 742 (case citations omitted).

**12.** Clearly, Robert Andrews was in actual physical possession. Jones Andrews claims an interest in the trees on the land. He claims he could

■ Neither *Jacobsen* nor *Soldal* defines "meaningful." Nor do these opinions inform whether "meaningful" is determined subjectively, by reference to the possessor, or objectively, by reference to a standard. *See, id.* at 591. Applying the reasoning of *Soldal*, the undersigned concludes that whether the criteria are subjective or objective, government acquisition of physical possession of property, or assertion of dominion and control (constructive possession) over it, which prevents the property from being sold, is a meaningful interference with possessory interest.

■ Applying *Jacobsen* and *Soldal*, placing a tax lien on the Andrews' property was a meaningful interference with possessory interests and, thus, a Fourth Amendment seizure.[13] We now inquire as to whether it was reasonable under Fourth Amendment standards of reasonableness.

Assuming the traditional view, that reasonableness is an objective standard as regards the seizure itself in light of law then in effect, we must decide whether "probable cause" is the appropriate measure of reasonableness for seizures of property where neither liberty nor privacy interests are implicated and where the seizure is not of evidence of a crime. As noted above, where a careful balancing of governmental and private interests suggests that the public interest is best served by a standard short of probable cause, the Supreme Court has been willing to adopt such a standard. Probable cause, however, is the point of departure.[14] In *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the Court, summarizing the appropriation of the reasonableness standard, commented:

> not sell them because of the certificates of tax liability. The question of Jones Andrews' interest in the trees attached to the property will be addressed in the section of this opinion discussing standing. A less restrictive reading of *Jacobsen* could bring non-possessory interests within the orbit of Fourth Amendment protection. *See, Davison, supra.*

13. *Jacobsen* and *Soldal* are silent as to whether this broad definition of seizure would encompass negligent acts by state actors. Negligence is not "reasonable" under the Fourth Amendment. There is no additional state-of-mind requirement to raise a Fourth Amendment claim (although

[S]ome seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity. In these cases, ..., the Court was applying the ultimate standard of reasonableness embodied in the Fourth Amendment. They are consistent with the general rule that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause. But they demonstrate that the exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry* and *Adams [v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)].

452 U.S. at 699–700, 101 S.Ct. at 2592.

The reasoning and principles articulated by reference to arrest in *Michigan* militate against a departure from the probable cause standard in the situation represented by the instant facts. The intrusion of the tax lien was substantial in that it prevented the exercise of fundamental rights attendant upon ownership of the property for a relatively long period of time and carried with it by analogy the essential attributes of a formal arrest. Law enforcement interests do not counterbalance. There was no exigency or danger of loss of evidence or other necessity of action to prevent frustration of law enforcement functions and interests. More-

> more than mere negligence is necessary for liability under procedural or substantive due process claims). This concern is raised by Judge Easterbrook in the Seventh Circuit *Soldal* opinion. 942 F.2d at 1080–1081. *See, C. E. Willoughby, SOLDAL V. COOK COUNTY: THE CONSTITUTIONAL TORT OF MOVING A "MOBILE" HOME,* 19 S. Ill. U.L.J. 419, 435 (1992).

14. *See, e.g.,* Justice Brennan's concurring opinion in *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), in which he states that "seizures of property must be based on probable cause." 462 U.S. at 715, 103 S.Ct. at 2649.

over, as the statutes above indicate, the basis for assessing the tax and filing the certificates was a determination that the owner was a dealer in possession, terms deriving from criminal law and to which the probable cause standard has traditionally been applied for warrants of arrest and seizure. Nor does it seem wise on policy grounds. As LaFave comments regarding evidence of crime, "the mere suspicion alternative, although explainable upon the superficially plausible ground that less evidence should be required merely to interfere with a possessory interest than to, say, make an arrest or enter premises, is undesirable because such a watering down of the probability nexus would result in wholesale seizures." *Wayne R. LaFave, 3 SEARCH AND SEIZURE § 6.7(a) (1996).*

Moreover, courts have uniformly imposed a probable cause requirement on tax seizure warrants. In *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977), the Court held that an IRS agent's warrantless nonexigent entry into the privacy of a taxpayer's office to seize the taxpayer's property subject to a Federal tax lien violates the Fourth Amendment. *See, United States v. Shriver,* 645 F.2d 221, 222 (4th Cir.1981). In *G.M. Leasing,* the Court found that there was "probable cause to believe that assets held by the petitioner were properly subject to seizure in satisfaction of the assessments." 429 U.S. at 351, 97 S.Ct. at 628.

By way of analogy, at least one court has applied the probable cause standard to the freezing of assets in a bank account, finding it to be a necessary and, perhaps, sufficient condition for seizing money in a bank account without a warrant. In *Colello v. United States Securities and Exchange Commission,* 908 F.Supp. 738 (C.D.Ca.1995), Plaintiffs' bank accounts in Switzerland were frozen by Swiss authorities upon request of the United States Department of Justice pursuant to a treaty. Plaintiffs filed suit challenging the constitutionality of the asset freeze. Plaintiffs contended that the Swiss asset freeze was a Fourth Amendment seizure and

that Defendants' failure to obtain a warrant rendered the freeze unreasonable. The Securities and Exchange Commission and the Department of Justice agreed that the freeze was in fact a seizure. 908 F.Supp. at 752–753. Citing *Jacobsen* and *Soldal,* the court stated:

> To obtain a warrant, of course, the government must have probable cause. When proceeding without a warrant, as here, the government's "conduct is governed by the other half of the Fourth Amendment, which declares the right of the people to be secure 'against unreasonable searches and seizures'. But it is clear that such an arrest or search is unreasonable if not based upon probable cause."

908 F.Supp. at 753 (quoting 1 LaFave and Israel, Criminal Procedure (1984), § 3.3, p. 184). The Court held that the Treaty's reasonable suspicion standard for the freeze of a citizen's assets violated the Fourth Amendment. 908 F.Supp. at 755.[15]

The undersigned concludes that probable cause is the appropriate standard for determining the reasonableness of the Fourth Amendment seizure represented by filing certificates of tax liability on the Andrews property. The Supreme Court has defined "probable cause" as cause "sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 861–862, 43 L.Ed.2d 54 (1974). "In dealing with probable cause . . . we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949).

 Applying these defining statements of probable cause, the undersigned concludes that the agents did not have probable cause to believe that Robert Andrews was a "dealer" or that he possessed the marijuana forming the basis of the controlled substance tax assessment. Therefore, they did not have probable cause to seize the Andrews proper-

---

15. A review of *Shepard's* indicates no reversal of this opinion. It has not been cited in other cases as authority yet.

ty by way of tax assessment and lien. Hughes and Crump knew that a large amount of marijuana had been offloaded into a barn on the Andrews' farm; that Shew had stated before his arrest that he had leased the barn from Robert Andrews; that a vehicle registered in the name of Robert Andrews' wife had driven by the surveillance team that night; and that when law enforcement officers went to Robert Andrews' house at 2:00 a.m. on the morning in question, he was fully dressed and appeared nervous. Hughes Dep. at 30–31; Crump Dep. at 28–30. Hughes knew that both Jones and Robert Andrews denied knowing of the off loading or barn leasing, and Hughes discussed the interviews of the Plaintiffs with Crump. Hughes Dep. at 40, 45. Hughes and Crump knew that Robert Andrews had not been arrested for a crime connected with the marijuana being offloaded onto his property. Hughes Dep. at 35. Agent Sellers told Hughes that law enforcement officers at the scene had concluded that there was not probable cause to connect Robert or Jones Andrews for such criminal activity. Sellers Dep. at 48. Shew never stated that Robert Andrews knew of any illegal activity associated with the alleged leasing. Robert Andrews told officers that the car was driven by his son, and that he was dressed because he fell asleep watching television. Under the circumstances, his nervousness admits of other reasonable explanations than being caught in the commission of a crime. Finally, there were no exigencies to this situation. Hughes and Crump had time to investigate further.

■ There was in this instance a Fourth Amendment seizure without probable cause and, therefore, a constitutional violation. We must now ask whether the right violated was clearly established such that a reasonable person in Defendants' position would have known that his conduct would violate this right. The undersigned concludes that the right was not clearly established.

First, the basis for determining that there was a constitutional violation is the reasoning of *Soldal,* and *Soldal* was not decided until five months after the events of the instant case. Prior to *Soldal,* it could be reasonably concluded that filing tax liens did not impli-

cate the Fourth Amendment. Indeed, the position of the Seventh Circuit, set out above, was that the Fourth Amendment did not come into play where privacy or liberty interests were not implicated. The law was not clearly established at the level of the instant application. Moreover, a reasonable officer could have concluded that filing tax liens raised Fourteenth Amendment questions which were adequately addressed by state postdeprivation procedures, and did not raise Fourth Amendment seizure issues.

A reasonable officer could have concluded similarly from *G.M. Leasing* and cases construing that decision. The holding in *G.M. Leasing* turned upon the invasion of privacy:

It is one thing to seize without a warrant property resting in an open area or seizable by levy without an intrusion into privacy, and it is quite another thing to effect a warrantless seizure of property, even that owned by a corporation, situated on private premises to which access is not otherwise available for the seizing officer.

429 U.S. at 354, 97 S.Ct. at 629–630. Thus, the Court decided, a warrantless entry by IRS agents into corporate offices violated the Fourth Amendment since ordinarily a search of private property without consent is unreasonable unless authorized by a valid search warrant.

Reasoning from *G.M. Leasing,* certain pre–*Soldal* decisions involving the acts of tax agents had concluded that the Fourth Amendment is not implicated where tax collection does not involve entry onto property. For example, in *McCarthy v. United States,* 563 F.Supp. 236 (N.D.Ill.1983), the court, citing *G.M. Leasing,* held that the filing of a federal tax lien against all real and personal property of a taxpayer did not involve invasion of the taxpayer's premises or seizure of his property and as such could not establish a Fourth Amendment violation:

The complaint alleges that Straughn violated plaintiff's Fourth Amendment right against unlawful seizure by filing a lien against his property. There is no Fourth Amendment deprivation, however, where the government, in an attempt to collect taxes, does not enter the taxpayer's own premises. ... The filing of the tax lien

by Straughn did not involve an invasion of plaintiff's premises or seizure of his personal property and as such cannot establish a Fourth Amendment violation.

563 F.Supp. at 239 (case citations omitted).

In *Baddour v. United States,* 802 F.2d 801 (5th Cir.1986), a third party, whose property was seized by the IRS while in possession of the taxpayer, brought a wrongful levy action against the United States and the agent in his individual capacity. The Fifth Circuit Court of Appeals held that the seizure did not violate the third party's Fourth Amendment rights:

> Posey did not violate any of Baddour's clearly established constitutional rights. The levy in question did constitute a seizure. ... However, any doubts as to its validity were resolved by the Supreme Court in *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977) There, the Supreme Court noted that where the government seizes property to collect delinquent taxes, the seizure, if it involves no invasion of one's premises, does not violate the Fourth Amendment.

802 F.2d at 807 (case citations omitted). *See also, Hutchinson v. United States,* 677 F.2d 1322, 1328 (9th Cir.1982); *Christy v. Keenan,* 81–2 U.S.T.C. ¶ 9701, 1980 WL 1768 (D.Md. 1980).

By contrast, at least one court had held that the seizure of plaintiff's bank accounts and the lien placed against her real property were unreasonable and in violation of her rights under the Fourth Amendment where the plaintiff was not the taxpayer under investigation. *Lojeski v. Boandl,* 602 F.Supp. 918, 923 (E.D.Penn.1984). Plaintiff Lojeski resided with a Thomas Treadway at plaintiff's residence. Boandl, an IRS agent, audited Treadway's returns, determined a liability, found that Treadway was trying to hide his assets through transfers or dissipation, and recommended jeopardy and termination assessments against Treadway. On the same day, he also recommended an identical assessment against plaintiff. Defendant Jessup seized plaintiff's personal assets by filing a nominee lien against her real property and by levying against her bank accounts. Treadway protested the assessments, and the Appeals Office found them not reasonable, recommended abatement in full of the assessments and release of the liens. The lien against plaintiff's assets was not released for three months and the seized funds not returned for five months. Plaintiff was prevented from running her horse business and was threatened with foreclosure by banks which held mortgages on her farm. In its opinion, the court does not analyze whether there was a Fourth Amendment seizure involved in the freezing of the bank accounts and the lien or support that conclusion with other case authority. The court simply states that there was a Fourth Amendment seizure and assumes that to be the case for its further analysis.[16]

Moreover, there was a lack of unanimity among the cases analyzing the standard for probable cause in the post–*G. M. Leasing* tax seizure context, as to whether the appropriate standard for probable cause was the traditional formulation as stated above or the administrative standard set forth in *Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) and adopted by the Fourth Circuit in *Shriver, supra.*

> The lower court cases pertaining to the probable cause standard for tax seizure warrants have split fairly cleanly into two camps, one following the *Camara* administrative test and the other adhering to traditional search criteria. In general, the applications of the standards have been impressionistic. Like the Supreme Court in *Barlow*'s, the courts first "place" tax seizures into either the administrative or the criminal category, and then evaluate the affidavit under the test that follows "logically" from this placement.

*Erin Suzanne Enright, Probable Cause for Tax Seizure Warrants,* 55 U. Chi. L.Rev. 210, 224–230 (1988).

The assessment statute itself calls for an assessment "based on personal knowledge or

---

**16.** A review of *Shepard's* indicates that this case has been cited as authority in only one case and never in the Fourth Circuit. *Benter v. Peck,* 825 F.Supp. 1411, 1421 (S.D.Iowa 1993)

information available to the Secretary." *G.S. 105–113.111*. As discussed above, an agent could reasonably have concluded that the Fourth Amendment was not implicated, that probable cause was not the appropriate standard, and that postdeprivation review of the informational basis of the assessment would afford adequate due process remedy. Alternatively, an agent could reasonably have concluded that probable cause would be based on the showing that this legislative standard had been satisfied.

In summary, the undersigned concludes that the right violated in this instance—to be free from unreasonable seizure under the Fourth Amendment—was not clearly established at the level of application. Moreover, the contours of the right were not sufficiently clear that a reasonable official would have understood that filing the certificates of tax liability violated the Fourth Amendment. An experienced officer could reasonably have concluded that the Fourth Amendment was not implicated in the filing of certificates of tax liability (i.e., that filing a tax lien was not a Fourth Amendment seizure) and that postdeprivation review adequately addressed denial of due process.[17] Therefore, Defendants Hughes and Crump are entitled to qualified immunity at the summary judgment stage of the litigation as to the individual and conspiratorial Fourth Amendment allegations of the complaint.[18]

### B. QUALIFIED IMMUNITY AS TO CONTINUING SEIZURE. (COUNT TWO: MALICIOUS PROSECUTION.) WHETHER THE RIGHT ALLEGEDLY VIOLATED WAS CLEARLY ESTABLISHED.

In Count Two of their complaint, Plaintiffs allege malicious prosecution in violation of § 1983 and the Fourth and Fourteenth Amendments. The basis of their § 1983 malicious prosecution allegation is *continuing unreasonable seizure* in violation of the Fourth Amendment.

Assuming, *arguendo*, that Plaintiffs have stated a cognizable malicious prosecution claim under § 1983, Defendants are entitled to qualified immunity at summary judgment as to such a claim for the same reasons set forth in the discussion of qualified immunity as to the seizure counts (One and Two). It was not clearly established that a seizure had occurred implicating the Fourth Amendment. If a Fourth Amendment seizure occurred, it was not clearly established that the probable cause standard was the proper appropriation of reasonableness. If the probable cause standard was the proper appropriation of reasonableness, it was not clearly established whether the traditional or administrative standard of probable cause was appropriate. A reasonable, experienced officer could reasonably have concluded that the Fourth Amendment was not implicated and that the probable cause standard did not apply.

### IV. STANDING

Defendants argue that Plaintiff Jones Andrews lacks standing to sue because the harm he alleges arose out of the filing of the certificates of tax liability, yet no assessment was issued against Jones Andrews, no tax lien was placed upon real property owned by him, and filing the lien did not prevent harvesting the trees. Thus, he has suffered no "injury in fact." Plaintiffs respond that the

---

17. As discussed above, it is not absolutely clear from the case law that probable cause is the necessary and sufficient condition of Fourth Amendment reasonableness as to the facts of this case, even were filing the lien determined to be a seizure. I have concluded that probable cause is, in fact, the appropriate standard, for reasons set out in the text, but that, even so, the circuits have differed as to what is necessary to show probable cause in tax seizure warrant applications.

Qualified immunity should be granted at summary judgment in this case because the law was not clearly established that filing the tax lien was a seizure implicating the Fourth Amendment,

and a reasonable, experienced officer could reasonably have concluded otherwise. However, the cases, as well as the instant facts, suggest that the question of Fourth Amendment *reasonableness* raises genuine fact issues which, but for summary judgment as to whether there was a Fourth Amendment seizure, should on these facts be preserved for trial.

18. This conclusion applies to both aspects of the alleged Fourth Amendment deprivation—assessment and lien, and keeping the lien in place after the Bankruptcy Court's ruling—because these acts are treated in the complaint and supporting briefs as seizure and continuing seizure.

filing of the certificates of tax liability against Robert Andrews injured Jones Andrews in that Jones and Robert jointly owned land from which the Christmas trees were harvested, the liens prevented the harvesting, and the resulting income shortfall precipitated Jones' later bankruptcy. Thus, Plaintiffs contend, there is a direct causal relation between Jones' injury and the conduct complained of, redressable by award of damages.

The requirements of standing are set forth in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992):

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized, ...; and (b) "actual or imminent, not 'conjectural' or 'hypothetical,' ".... Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." ... Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

504 U.S. at 560–561, 112 S.Ct. at 2136.

To survive a summary judgment motion, the parties invoking federal jurisdiction must set forth by affidavit or other evidence specific facts to support their claim. 504 U.S. at 559–563, 112 S.Ct. at 2136–2137.

In the instant case, Plaintiff Jones Andrews has sufficiently satisfied the requirements of standing to survive the summary judgment motion. First, a reasonable jury could find by a preponderance that Jones Andrews suffered an injury-in-fact in that his inability to sell trees eventuated in his bankruptcy. Plaintiffs allege and by affidavit aver that the filing of the certificates of tax liability against Robert Andrews effectively froze any property in which he was a listed owner, including the harvesting of Christmas trees from such property. Jones Andrews Aff. at ¶ 8; Robert Andrews Aff. at ¶ 8. Jones Andrews and Robert Andrews jointly owned land used for Christmas tree farming. Jones Andrews Aff. at ¶ 7; Robert Andrews Aff. at ¶ 7. As a result of the filing of the Certificate of Tax Liability, they were unable to cut Christmas trees from this property in the fall and winter of 1992 and thus were unable to earn their usual income from Christmas tree sales. Jones Andrews Aff. at ¶ 8; Robert Andrews Aff. at ¶ 8. Hughes was aware that Jones Andrews was in partnership with Robert Andrews and that the property seized was owned jointly by them. Hughes Dep. at 93.

A jury could find by a preponderance that the injury directly resulted from the Defendant's acts. As a result of the filing of certificates of tax liability, Jones Andrews could not receive income from the harvesting of Christmas trees on property he owned jointly with Robert Andrews, and consequently, he was unable to meet his obligations and was forced into bankruptcy. Jones Andrews Aff. at ¶ 9.[19]

---

**19.** Plaintiffs' causation rests upon their interpretation of the effect of the lien. They assert that the certificates of tax liability prevented them from harvesting Christmas trees, and this loss of income precipitated bankruptcy.

Under G.S. § 105–242(c), certificates of tax liability are to be treated as judgments. Under G.S. § 1–234, a recorded judgment acts as a lien upon real property. The Christmas trees arguably are timber, *see, cases cited in Plaintiffs' Surreply at 4*, and timber is real property. Thus, the trees were subject to the lien effected by the filing of the certificates of tax liability. Such liens are "superior to all other liens, assessments, charges, rights, and claims of any and every kind in and to the real property to which the line for taxes attaches regardless of the claimant and regardless of whether acquired prior or subse-

quent to the attachment of the lien for taxes." G.S. § 105–356(a)(1). *See also, G.S. § 105–356(a)(3); G.S. § 105–241(d)*. Therefore, Defendants are not entitled, as a matter of law, to a determination at summary judgment that Jones Andrews lacks standing on the ground that, beyond genuine issue, he fails to demonstrate the requisite causal link.

In addition, as noted in the text, Plaintiffs state by affidavit that *as a matter of fact* they were unable to sell Christmas trees *because of* the tax liens. Defendants do not counter this fact averment with contrary facts. The period of time between filing the liens and declaration of bankruptcy does not sever causation or render it indirect, and Defendants point to no intervening factors.

Third, Plaintiffs assert, and Defendants do not deny, that the injury is compensable in money damages, and, thus, redress is not speculative. For these reasons, Jones Andrews has satisfied the requirements of standing for summary judgment purposes, and summary judgment for Defendants as to Jones Andrews' standing should be denied.

## V. STATE LAW CLAIMS: MALICIOUS PROSECUTION IN VIOLATION OF STATE LAW (COUNT THREE); INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS (COUNT FOUR); CONSPIRACY TO PROCURE AND CAUSE MALICIOUS PROSECUTION IN VIOLATION OF STATE LAW (COUNT SIX); CONSPIRACY TO PROCURE AND CAUSE THE INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS IN VIOLATION OF STATE LAW (COUNT EIGHT)

In addition to their § 1983 claims, on the basis of the same facts Plaintiffs bring state law claims of malicious prosecution, intentional infliction of emotional distress, and conspiracy as to malicious prosecution and intentional infliction of emotional distress.

When a case contains federal claims as well as state claims over which the court has supplemental jurisdiction, the court "may decline to exercise supplemental jurisdiction over [the state claims] if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Dismissal of the state claims should be without prejudice. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (explaining the discretionary nature of pendent jurisdiction, suggesting that a federal court should dismiss pendent state law claims if the federal claims are dismissed before trial); *Ridenour v. Andrews Fed. Credit Union*, 897 F.2d 715, 722 (4th Cir.1990); *Sigmon v. Poe*, 564 F.2d 1093, 1096 (4th Cir.1977); *Thompson v. Prince William County*, 753 F.2d 363, 365 (4th Cir.1985); *Torchinsky v. Siwinski*, 942 F.2d 257, 264 (4th Cir.1991).

Since summary judgment is granted as to Plaintiffs' § 1983 claims, which are the only claims over which this court has original jurisdiction, it is appropriate to dismiss Plaintiffs' state law claims without prejudice. No basis for diversity jurisdiction appears, since all parties are alleged by Plaintiffs to be North Carolina residents. The remaining state law claims do not involve issues of federal policy.

## VI. ELEVENTH AMENDMENT AND SOVEREIGN IMMUNITY

The caption of the complaint states that Crump and Hughes are being sued only in their individual capacity, not in their official capacity. The State of North Carolina is not a defendant in this action, nor is the Department of Revenue. The assessment and tax liens were withdrawn before any collection of tax; and Plaintiffs do not seek any refund of taxes or damages which would necessarily come from the State's treasury. Therefore, the Eleventh Amendment and the doctrine of sovereign immunity do not apply to this case. *See, Hafer v. Melo*, 502 U.S. 21, 29–31, 112 S.Ct. 358, 364–365, 116 L.Ed.2d 301 (1991).

## VII. TAX INJUNCTION ACT AND PRINCIPLES OF COMITY

Defendants contend that this action is barred by the Tax Injunction Act of 1937, 28 U.S.C. § 1341, which provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."

Defendants contend that the instant suit would require the court to enjoin collection of state taxes or hold a state tax law unconstitutional by way of declaratory judgment. *California v. Grace Brethren Church*, 457 U.S. 393, 102 S.Ct. 2498, 73 L.Ed.2d 93 (1982); *Fair Assessment in Real Estate v. McNary*, 454 U.S. 100, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981). Moreover, North Carolina affords Plaintiffs a "plain, speedy and efficient" remedy because North Carolina procedure provides taxpayers with a full hearing and a judicial determination for raising any and all constitutional objections to the tax. *Rosewell v. LaSalle National Bank*, 450 U.S. 503, 514,

101 S.Ct. 1221, 1229–1230, 67 L.Ed.2d 464 (1981); *N.C.G.S. § 105–267, 105–241.1–3, 105–266.1.* Finally, Defendants contend that federal courts should dismiss federal challenges to state tax administration under principles of comity.

Defendants arguments are not persuasive. The instant action does not seek to enjoin, suspend or restrain the assessment, levy or collection of any state tax and does not seek refund of taxes assessed. Indeed, no tax was ever collected. Nor does the instant action challenge the constitutionality of the Controlled Substance Tax or seek a declaratory judgment regarding its validity.

■ Moreover, G.S. § 105–267 allows a suit to be brought only for refund, and refund is not at issue here since the assessment was never paid. This section does not authorize challenges to the unconstitutional acts of revenue agents in their individual capacities for their individual acts. Nor does this statute provide for the recovery of consequential damages. Thus, Section 267 offers these Plaintiffs no plain, speedy and efficient remedy.

The alternate routes suggested by Defendants, §§ 105–241.1 *et seq.* and 105–266.1, do not afford a plain, speedy and efficient remedy to these Plaintiffs. If an assessment is rendered by the Department of Revenue, the taxpayer can either pay the tax and seek a refund under Section 267 or seek review by the Tax Review Board under Section 241.2, under which the Tax Review Board is to make findings "with respect to [the] liability for the tax or additional tax assessed by the Secretary." A taxpayer can appeal the decision of the Tax Review Board by paying the tax or posting a bond and seeking court review under Chapter 150B of the North Carolina General Statutes. G.S. § 105–241.3. The court can then consider constitutional claims. G.S. § 150B–51(b)(1).

The assessment against the Andrews was vacated. Thus, there is no assessment as to which review can be sought. The Tax Review Board cannot address constitutional challenges unrelated to the assessed tax. A reviewing court can only affirm, reverse or modify the Tax Review Board's decision and could not award the type of damages sought in the instant case. G.S. § 150B–51(b).

Section 105–266.1 does not avail because it has to do with claims for refunds of overpaid taxes, and here no tax has been paid. Nor does this statute provide for consideration of constitutional issues.

For these reasons, neither the Tax Injunction Act nor principles of comity prevent the federal court from considering Plaintiffs' claims.

For the foregoing reasons, **IT IS ORDERED, ADJUDGED, AND DECREED** that Defendants' Motion for Summary Judgment is **granted** as to Plaintiffs' claims arising under 42 U.S.C. § 1983 (Counts One, Two, Five, and Seven). Plaintiffs' claims arising under state law (Counts Three, Four, and Six) are **dismissed without prejudice.** Defendants' Motion to Strike Plaintiffs' Surreply is **denied.**

## JUDGMENT

**THIS MATTER** is before the undersigned pursuant to 28 U.S.C. § 636(c). Defendants moved for summary judgment as to Plaintiffs' claims under 42 U.S.C. § 1983 and state law [docs 26, 38], and to strike Plaintiffs' Surreply [doc 36]. Defendants' Motion for Summary Judgment was **granted** as to Plaintiffs' claims arising under 42 U.S.C. § 1983 (Counts One, Two, Five, and Seven); Plaintiffs' claims arising under state law (Counts Three, Four, and Six) were **dismissed without prejudice;** and Defendants' Motion to Strike Plaintiffs' Surreply was **denied** in a Memorandum of Decision filed simultaneously with this Judgment.

It is hereby **ORDERED, ADJUDGED, and DECREED** that Judgment be entered for Defendants and that this case be dismissed.